10 A.3d 282

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Imanuel Bassil ALI, a/k/a Emanuel Lester, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 5, 2008.

Decided Dec. 29, 2010.

72

See also, 554 Pa. 644, 722 A.2d 997.

74

76

Imanuel Bassil Ali, pro se.

Hugh J. Burns Jr., Anthony V. Pomeranz, Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

This is a *pro se* capital appeal from the Order of the Court of Common Pleas of Philadelphia County denying appellant's petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons that follow, we affirm.

On November 12, 1991, a jury sitting before the Honorable Ricardo C. Jackson convicted appellant of first-degree murder, aggravated assault, and possessing an instrument of crime. The convictions arose from the brutal killing of Sheila Manigault, whose beaten and scalded body was found on the morning of April 6, 1990 submerged in the bathtub of the West Philadelphia apartment that she shared with her three young children.[1] After finding two aggravating circumstances and no mitigating circumstances, the same jury returned a sentencing verdict of death on the murder charge. *See* 42 Pa.C.S. § 9711(c)(1)(iv) ("[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance....").[2] On direct appeal, this Court unanimously affirmed appellant's convictions and judgment of sentence. *Commonwealth v.*

---

1. The facts underlying appellant's convictions are set forth in detail in *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997 (1998).

2. The two aggravating circumstances that the jury found were: (1) in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7); and (2) the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8).

*Lester,* 554 Pa. 644, 722 A.2d 997 (1998). This Court denied reargument on April 19, 1999.

Appellant filed a timely *pro se* PCRA petition on June 25, 1999, and an amended petition on September 15, 1999. On January 12, 2000, the PCRA court appointed Lee Mandell, Esq., as counsel for appellant, but appellant soon requested permission to proceed *pro se.* Appellant filed *pro se* supplemental PCRA petitions on June 20, 2000 and November 3, 2000. In early 2001, the PCRA court ordered a mental health evaluation, which was conducted on February 23, 2001. The evaluation resulted in a report that appellant had no mental health issues or substance abuse issues at the time, understood the "proper roles" and "major principles involved in a court of law," and was competent to assist in his own defense. Mental Health Evaluation Report of James G. Jones, M.D., 2/26/01, at 2 (unnumbered). The PCRA court also conducted an extensive colloquy with appellant on the record before granting his request to proceed *pro se* on March 23, 2001. The Court appointed Attorney Mandell as advisory counsel. Thereafter, appellant filed an additional *pro se* supplemental PCRA petition on September 19, 2001; the Commonwealth filed a motion to dismiss on April 19, 2002; and appellant filed yet another supplemental *pro se* petition on May 30, 2002. The court sent appellant a notice of intention to dismiss pursuant to Pa.R.Crim.P. 907 on August 14, 2002. However, on September 13, 2002, the PCRA court found appellant incompetent to proceed *pro se,* based upon its further review of his submissions, and noted that appellant and Attorney Mandell had irreconcilable differences. The court thus allowed Attorney Mandell to withdraw and Daniel A. Rendine, Esq., was appointed as counsel for appellant on September 20, 2002. In November 2002, however, the PCRA court again permitted appellant to represent himself and directed Attorney Rendine to serve as back-up counsel. The court then held an evidentiary hearing on April 28, 2003 and, on June 27, 2003, denied PCRA relief and formally dismissed Attorney Rendine from the case.

After appellant appealed to this Court, attorneys from the Defender Association of Philadelphia, Federal Court Division, Capital *Habeas* Unit ("Federal Defender") entered appearances on behalf of appellant and filed a Pa.R.A.P. 1925(b) statement on appellant's behalf on April 12, 2004. Appellant then filed his own 1925(b) statement, which was dated April 12, 2004 and docketed on April 26, 2004. On May 16, 2006, appellant filed a *pro se* Petition to Remove Counsel and Proceed *Pro Se*. On June 6, 2006, the Federal Defender filed a Response, urging denial of appellant's petition. On June 15, 2006, this Court ordered the PCRA court to conduct a hearing on appellant's request to proceed *pro se*, pursuant to *Commonwealth v. Grazier*, 552 Pa. 9, 713 A.2d 81 (1998). We did not relinquish jurisdiction.

At a hearing on March 30, 2007, the Commonwealth asserted that since appellant clearly had no desire to cooperate with the Federal Defender or undergo further competency evaluation by doctors, the *Grazier* hearing should proceed "with all due haste." N.T., 3/30/07, at 4. The Federal Defender responded that in its view, appellant was not competent to waive counsel and that it had a written report from a doctor who did not believe appellant was competent. The Federal Defender sought to have a competency proceeding held prior to the *Grazier* hearing. The PCRA court took note of the "stalemate" created when appellant's refusal to cooperate with the Federal Defender respecting his competency led the Federal Defender to conclude that appellant was incompetent. The court stated that the matter could not be delayed any further, denied the request for a pre-*Grazier* competency hearing, and scheduled the *Grazier* hearing for April 27, 2007. The Federal Defender's appeal of that interlocutory ruling was quashed by this Court in an August 24, 2007 order.

The *Grazier* hearing was held on April 27, 2007. The Federal Defender attempted to raise new substantive claims in addition to the *Grazier* question, but the PCRA court declined to consider claims other than the one remanded to it. Following the hearing, the PCRA court issued an order on the same date finding appellant competent to waive counsel and

permitting him "to proceed *pro se* without standby counsel being appointed in accordance with [his] request at the *Grazier* hearing." The Federal Defender appealed that order and on July 25, 2007, the PCRA court issued an opinion on the *Grazier* issue. The PCRA court noted that its determination that appellant's waiver of counsel was knowing and voluntary was supported by the court-ordered mental health evaluation, the *Grazier* colloquy, and appellant's behavior at the *Grazier* hearing as well as at several previous hearings.[3] The Federal Defender's unauthorized appeal from the grant of relief appellant himself had requested through the *Grazier* proceedings was ultimately quashed by order of this Court dated October 31, 2007.

The appeal has finally been briefed, ably enough by appellant, and is ready for disposition. Our general review of a PCRA court's decision is limited to examining whether the court's findings of fact are supported by the record and whether its legal conclusions are free of error. *Commonwealth v. Cook*, 597 Pa. 572, 952 A.2d 594, 601 (2008).

## DISCUSSION

All twelve of appellant's claims allege ineffective assistance of counsel. "It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Commonwealth v. Grib-*

---

3. In particular, the PCRA court noted that: (1) it "undertook a prolonged process in determining [appellant]'s competency"; (2) the mental health evaluation revealed no psychological disorders that would prevent appellant from competently litigating his appeal; (3) during the *Grazier* hearing, appellant "exhibited an understanding and appreciation for the gravity of his decision to proceed without counsel"; and (4) at each opportunity the court had to observe appellant, including at several hearings, the court found appellant to "exhibit[ ] a more than usual understanding of the law and its procedures." PCRA Ct. Op., 7/25/07, at 3, 6. A motion subsequently filed by the Commonwealth requesting a remand, another competency hearing, and appointment of counsel was denied by order of this Court dated September 28, 2007.

*ble,* 580 Pa. 647, 863 A.2d 455, 460 (2004) (collecting cases). The contours of the inquiry are as follows:

> To better focus the *Strickland* analysis, this Court has applied the performance part of the test by looking both to the arguable merit of the claim lodged against counsel as well as the objective reasonableness of the path taken, or not taken, by counsel. *E.g., [Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 855 n. 19 (2003), *cert. denied,* 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2003) ]. Thus, the constitutional ineffectiveness standard requires the defendant to rebut the presumption of professional competence by demonstrating that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. (Michael) Pierce* [567 Pa. 186], 786 A.2d 203, 213 (Pa. 2001); *Commonwealth v. Kimball* [555 Pa. 299], 724 A.2d 326, 333 (Pa.1999). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *(Michael) Pierce,* 786 A.2d at 221–23; *see also Commonwealth v. Albrecht* [554 Pa. 31], 720 A.2d 693, 701 (Pa.1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.").

*Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 829–30 (2005), *cert. denied,* 546 U.S. 984, 126 S.Ct. 564, 163 L.Ed.2d 474 (2005).[4] Respecting prejudice, "[a] reasonable probability is a probability that is sufficient to undermine confidence in

---

4. As this Court has repeatedly noted, the *Pierce* and *Strickland* standards themselves are substantively coextensive. *See, e.g., Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 594 n. 8 (2007); *Commonwealth v. Hawkins,* 586 Pa. 366, 894 A.2d 716, 721 n. 10 (2006); *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 829 (2005); *Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 890 (2004); *Commonwealth v. Busanet,* 817 A.2d 1060, 1066 n. 10, 11 (2002).

the outcome of the proceeding." *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

■ In addition, because appellant was represented by new counsel on direct appeal, and his appeal was pending on collateral review prior to this Court's decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), those of appellant's ineffectiveness claims deriving from trial counsel's performance are cognizable only as "layered" claims. *Id.* at 739 n. 16. To secure relief as to these claims, appellant must plead and prove *Strickland/Pierce* ineffectiveness as to each relevant layer of representation. *See Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1023 (2003).

## A. Failure to raise prosecutorial misconduct claim on appeal

■ Appellant first claims that direct appeal counsel was ineffective for abandoning or undermining appellant's claim that the prosecutor committed "misconduct" during his opening statement and misled the jury when he asserted that the name appellant gave when he was arrested, Imanuel Ali, was an alias used for purposes of concealment. Appellant's birth name was Emanuel Lester but, he argues, "Ali" is now his legal surname, which he has been using since 1975, and had legally changed in 1983, eight years before the murder of Sheila Manigault. Appellant contends that the prosecutor knew or should have known that "Ali" was his new surname and that the prosecutor's description of it as an alias created an unfair and prejudicial impression of appellant's evasiveness and consciousness of guilt and thereby deprived him of a fair trial under the constitutional guarantees of equal protection and due process. Appellant adds that the Commonwealth failed to disclose to the defense that it would be introducing evidence of appellant's use of different names on various documents and that this non-disclosure prejudiced him by preventing him from rebutting the Commonwealth's misrepresentation of the evidence and addressing the eventual jury instruction on flight/evasion. Appellant contends that if the jury had been made aware that at the time of his arrest, the

name he gave was his then-legal name (Imanuel Ali) and that he possessed documents identifying him by that name, there is a strong possibility that it would have concluded that he displayed no consciousness of guilt.

Appellant asserts that the foregoing claim was raised and preserved in his own *pro se* supplemental Rule 1925(b) statement as a distinct and independent claim of prosecutorial misconduct, but the claim was abandoned or undermined by direct appeal counsel's decision to present it as a matter of trial counsel ineffectiveness. Appellant argues that the claim as he presented it post-verdict was stronger than the derivative ineffectiveness claim raised by direct appeal counsel and stood a better chance of success on appeal.

In response, the Commonwealth argues that appellant has waived any claim sounding in prosecutorial misconduct because he did not object at trial to the prosecutor's reference to "Imanuel Ali" as an alias, much less did he assert a constitutional violation. The Commonwealth relatedly adds that appellant's claim that direct appeal counsel was ineffective for failing to assert this claim fails because appellant does not argue trial counsel's underlying ineffectiveness for failing to object and also because the claim was not included in appellant's present Rule 1925(b) statement in the present appeal. The Commonwealth also notes that appellant's claim is unsupported with case law or relevant legal argument. Finally, the Commonwealth posits that appellant's claim in this regard was previously litigated on direct appeal.

The PCRA court found that this claim was previously litigated on appellant's direct appeal, where this Court held:

Trial counsel testified at the hearing on post-verdict motions that he did not know that appellant had changed his name to the name which the prosecution considered to be an alias. Counsel's failure to object to the characterization of the name as an alias was clearly reasonable given that counsel had no knowledge of appellant's name change.

722 A.2d at 1008.

■ The failure to raise a contemporaneous objection to a prosecutor's comment at trial waives any claim of error arising

from the comment. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 423 (2008) (citing Pa.R.A.P. 302(a), which states that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"). An appellant may, however, pursue a derivative and collateral claim based upon counsel ineffectiveness for failing to raise that contemporaneous objection. *See id.* at 428.

We agree with the Commonwealth that appellant's underlying claim of "prosecutorial misconduct" was waived at trial, and thus, direct appeal counsel cannot be deemed ineffective for pursuing the claim as one sounding in trial counsel ineffectiveness, rather than as a claim of trial court or prosecutorial error. At trial, the prosecutor said the following during his opening statement:

> You will hear of the efforts of the assigned detective, Detective Dougherty, to locate Mr. Lester, because Mr. Lester never, as I said, appeared in [the area of the murder] again. He was up on Broad Street, and when the police arrested him he had a different name, he had the name Emanuel [sic] Ali, further evidence of his efforts to conceal what he had done and how he was arrested.

N.T., 11/6/91, at 32. The transcript reveals no contemporaneous objection by defense counsel, which appellant does not dispute. Indeed, counsel's failure to object was the very basis for the derivative claim of trial counsel ineffectiveness that was specifically raised and rejected on direct appeal. Appellant's argument that he preserved the claim by raising it in his *pro se* Rule 1925(b) statement cannot undo the trial-level waiver: a Rule 1925(b) statement is not a substitute for the contemporaneous objection required at trial. Moreover, appellant was represented by counsel on appeal, so his *pro se* Rule 1925(b) statement was a legal nullity. *See Commonwealth v. Ellis*, 534 Pa. 176, 626 A.2d 1137, 1139, 1141 (1993) ("[T]here is no constitutional right to hybrid representation either at trial or on appeal.... [A defendant may not] confuse and overburden the court by his own *pro se* filings of briefs at the same time his counsel is filing briefs on his behalf.").

Accordingly, any primary claim of prosecutorial misconduct or, more precisely, any claim of trial court error in responding to a preserved, contemporaneous objection to alleged prosecutorial misconduct based upon the above-quoted passage was waived. *See Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 28–29 (2008) ("Where, as here, no objection was raised, there is no claim of 'prosecutorial misconduct' as such available. There is, instead, a claim of ineffectiveness for failing to object, so as to permit the trial court to rule."). Furthermore, appellant specifically disavows any derivative claim of trial counsel ineffectiveness for failure to object, and for obvious reasons: that claim was previously litigated on direct appeal. Because appellant has not shown ineffectiveness on the part of direct appeal counsel for raising this issue as a cognizable claim of trial counsel ineffectiveness, rather than as an unavailable claim of trial court error, the present claim necessarily fails.

### B. Failure to object to expert testimony

Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to object to testimony by the Commonwealth's criminal evidence expert, Caesar Mujica. Mr. Mujica testified regarding the "red substance" visible on a toy kitchen set at the crime scene, which was also visible in a crime scene photograph. Appellant argues that neither the red substance nor the toy kitchen set was referenced on the property receipt listing the evidence collected at the scene and sent to the laboratory to be analyzed; thus, the expert could not properly say that the substance was the victim's blood or even blood at all. Appellant contends that trial counsel should have objected to Mr. Mujica's opinion that the substance was blood, which permitted the prosecutor to refer to the blood-smeared toy kitchen set in what appellant alleges was a "misrepresented" characterization of the events surrounding the murder as an "urban horror story." That characterization, appellant argues, misled and inflamed the jury. Moreover, appellant labels these references as "fabrications" and deliberate misrepresentations in the Commonwealth's case against him.

The Commonwealth responds by arguing, *inter alia,* that trial counsel was not obliged to object simply because the Commonwealth had not tested every single bloody item from the crime scene. The Commonwealth asserts that Mr. Mujica's inference was supported by evidence that there was blood found throughout the victim's apartment, and that appellant has not shown that Mr. Mujica, as a matter of fact, was wrong. Furthermore, in the Commonwealth's estimation, the mere fact that "one of the many places in which blood was found [at the scene] was on a child's toy is a minor point; its exclusion would not have likely changed the trial result." Commonwealth's Brief at 17–18 n. 14. Because there was nothing in either Mr. Mujica's statement or the prosecutor's comments that called for objection, the Commonwealth submits, trial counsel was not ineffective for failing to object, and direct appeal counsel cannot have been ineffective for not having pursued the matter on appeal.[5]

The prosecution may not knowingly and deliberately misrepresent the evidence in order to gain a conviction. *Miller v. Pate,* 386 U.S. 1, 6–7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). Nevertheless, a claim of purposeful prosecutorial misrepresentation will not stand if examination of the record fails to reveal any indication of deceptive tactics on the part of the prosecution. *See Commonwealth v. Lobel,* 514 Pa. 163, 523 A.2d 304, 308 (1987). Minor discrepancies in the Commonwealth's case will not be considered false evidence. *Commonwealth v. Williams,* 450 Pa. 327, 301 A.2d 867, 869 (1973); *see also Commonwealth v. Harris,* 572 Pa. 489, 817 A.2d 1033, 1051–52 (2002).

Relevant to this claim, Mr. Mujica testified on direct examination as follows:

**5.** The PCRA court did not address this issue in its opinion. Review of the record indicates that appellant included it in his September 15, 1999 *pro se* amended PCRA petition at pp. 5–6. The counseled Rule 1925(b) statement filed on petitioner's behalf on April 12, 2004 by the Federal Defender does not mention this claim either, but appellant referenced this claim at # 3 of his own *pro se* Rule 1925(b) statement filed on April 26, 2004. As the claim is resolvable on the existing record, we will pass upon it.

Q: Did you obtain, I think in the vernacular you gentlemen use, did you obtain physical evidence which was termed red substance?

A: That is correct.

Q: That would be blood?

A: Yes.

Q: Can you tell the ladies and gentlemen of the jury in what particular areas, if you recall, a red substance, blood, was recovered or noted?

A: It was all over the apartment.

N.T., 11/6/91, at 78. Mr. Mujica then testified at length as to the various places throughout the apartment where he discovered a "red substance," including the following description of a photograph of the murder scene: "This is a close up view showing a red substance on the outside of a toy kitchen set near the west wall of the southeast bedroom." *Id.* at 90.

The crime scene investigators' apparent failure to reference either the toy kitchen set or the red substance visible on the toy set on the master list of the evidence collected does not render Mr. Mujica's testimony, to which there was no objection, untrue, incorrect, or unsupported by the evidence of record; much less does it prove fabrication on the part of the prosecution, as appellant intemperately suggests. Mr. Mujica, as well as other witnesses, testified to the undisputed fact that there was blood found throughout the victim's apartment in the aftermath of the murder.[6] The mere fact that the "red substance" on the toy set was not itself listed on the police evidence property receipt or tested at the laboratory does not mean that the photograph Mr. Mujica described was fabricated, nor does it make Mr. Mujica's testimony untrue, mislead-

6. For example, Detective James Dougherty of the Philadelphia Police Department's Homicide Division testified, without objection, as follows:

Q: As regards blood stains and splatters that you saw, there were splatters in the bathroom, living room, kitchen, the hallway and bathroom as well?
A: Yes, sir, that is correct.

N.T., 11/6/91, at 112.

ing, or a prosecutorial "fabrication" that obliged trial counsel to object.

Of course, counsel could have objected to any reference to the substance on the toy set on grounds that it had not specifically been tested, but to what ultimate purpose? The investigators' failure to sample and test the "red substance" from that particular item does not defeat the logical inference that the substance on the toy set was blood, since it is indisputable that blood was found throughout the apartment. By the same token, appellant has not demonstrated that the references caused *Strickland* prejudice. In light of the extensive and undisputed presence of blood throughout the victim's apartment, appellant has not shown a reasonable probability that the verdict would have been different if an objection had been made to the above testimony of Mr. Mujica and the prosecutor's mention of blood on the toy kitchen set. Accordingly, this layered *Strickland* claim fails.

### C. Failure to object to in-court competency examination of child witness

Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to object to the trial court conducting the competency examination of the victim's daughter, N.M., in the presence of the jury.[7] Appellant argues that at the time of his trial, it was "accepted practice" to hold competency inquiries outside the presence of the jury, citing *Commonwealth v. Repyneck,* 181 Pa.Super. 630, 124 A.2d 693, 696 (1956) ("[T]he jury was withdrawn from the court room and the court below heard testimony relative to the competency of the witness. This was proper and in accordance with accepted practice."). Appellant further argues that since competency to testify is a legal determination that is irrelevant to the jury's role as factfinder, conducting the competency inquiry in the jury's presence likely led the jury to confuse competency with credibility. In particular, appellant contends that, by declaring N.M. compe-

7. N.M. was four years old at the time of the murder in April 1990; she was six years old when she testified at trial. N.T., 11/7/91, at 8.

tent in the jury's presence after the conclusion of the examination, the trial court unfairly bolstered the child's credibility.

Appellant asserts that a claim based upon trial counsel's failure to object was raised in the *nunc pro tunc* post-sentencing motions filed by appellate counsel, but counsel then abandoned the claim on appeal. Appellant further relies upon *Commonwealth v. Washington,* 554 Pa. 559, 722 A.2d 643, 647 (1998), where this Court established a *per se* rule requiring that child witness competency hearings be conducted outside the presence of the jury. *Washington* was handed down on the same day this Court's opinion was filed in appellant's direct appeal. In appellant's view, if direct appeal counsel had pursued this ineffectiveness claim, there is a reasonable probability that appellant could have benefited from the new *per se* rule in *Washington,* even though *Washington* involved a preserved claim, not a collateral *Strickland* attack.

Appellant argues in the alternative that trial counsel should have requested a special jury instruction distinguishing between competency and credibility and emphasizing the jury's role in the latter circumstance. Appellant adds that trial counsel's ineffectiveness in this regard should also have been pursued on appeal. Appellant speculates that without this specific instruction, the jury likely construed the trial court's ruling that N.M. was competent as approval of her credibility and veracity.

The Commonwealth responds, *inter alia,* that appellant's claim of trial counsel ineffectiveness fails because at the time of trial, there was no requirement that child witness competency hearings be conducted outside the presence of the jury. The Commonwealth adds that the court's general instructions to the jury as to witness credibility were sufficient and that appellant has not established what a specific instruction as to N.M.'s competency would or should have said, by which authority such an instruction was required, or how such an instruction would likely have resulted in a different overall verdict.

In rejecting this layered claim, the PCRA court noted that the law at the time of appellant's trial did not prohibit holding competency hearings in the jury's presence, and thus appellant's underlying claim was meritless. The PCRA court added that even assuming there was a legal basis upon which to object, appellant failed to prove that the outcome of the trial would have been different if counsel had acted otherwise, in light of the overwhelming evidence of appellant's guilt and the fact that N.M.'s testimony coincided with her prior implication of appellant, as well as the physical evidence and the autopsy results. The PCRA court also concluded that the trial court's competency finding did not bolster N.M.'s credibility, particularly because the trial court said nothing to influence the jury's consideration of her veracity. In the PCRA court's estimation, the competency examination was conducted in accordance with governing legal requirements: both counsel questioned N.M. concerning her duty to tell the truth and her answers to those questions showed that she "possessed the requisite degree of awareness and ability to recall past events and ability to recount them accurately to be declared competent." The PCRA court did not separately address appellant's claim that trial counsel was ineffective for failing to request a special instruction concerning the distinction between competence and credibility. PCRA Ct. Op. at 8–13.

*Washington* involved a direct appeal where the defendant specifically preserved an objection at trial to competency examinations of the two child witnesses being conducted in the presence of the jury; the witnesses were also the victims of the sexual assaults with which the defendant was charged. The Court majority noted first that competency is a legal issue to be decided by a judge, but expressed concern that, because assessing the truthfulness of a witness during trial is a function of the jury as factfinder, conducting competency proceedings in the jury's presence "invariably" could influence the jury's credibility determination. The majority expressed particular concern that the trial judge's in-court **ruling** on competency could be viewed as a judicial "endorsement" of the witness's credibility. In addition, the majority noted, ques-

tions relevant to a competency examination, *i.e.*, respecting the witness's appreciation for the importance of telling the truth, might be "improper during trial before the jury because they would be irrelevant, call for hearsay, or violate evidentiary rules and statutes" and thus, "conducting the hearing in the presence of the jury also gives rise to the risk that the jury may hear inadmissible testimony." 722 A.2d at 646.

Following these preliminary observations, the *Washington* majority noted that the issue before it was "one of first impression" and surveyed the approach of other jurisdictions, which revealed "a division of authority." *Id.* at 646. The *Washington* majority further acknowledged support for the contrary view that "there are valid reasons to allow a jury to observe *voir dire* of a child witness." *Id.* at 647. The opinion quoted an unreported decision from the Ohio Court of Appeals that relied upon "commentators" who had addressed this issue and stated that:

> There are occasions when no harm will result from the jury hearing foundational matters[, and] in such cases, convenience and time considerations are better served by not excusing the jury. Moreover, in many instances, the same evidence which is relevant to the foundation requirements is also relevant to weight and credibility. Allowing the jury to hear such foundational evidence avoids duplication and waste of time.

*Id.* (quoting *State v. Harris*, 1988 WL 38034 (Ohio App. 5 Dist.1988)).[8] The *Washington* majority went on to note that the *Harris* court, while stating that "it is not plain error" to conduct a competency examination in the presence of the jury as long as the defendant does not object and the jury is

---

8. In *Harris*, the children witnesses were the victims of the defendant's sexual assaults, which led to his conviction on, *inter alia*, three counts of rape. The appellate court affirmed, noting first that this was a matter within the trial court's discretion and that, generally, as long as the jury is properly instructed, no legislative direction or interest of justice precluded competency determinations from being held in the jury's presence. In association with this general discussion, the *Harris* court quoted from several Ohio treatises on evidence, including the language from "Weissenberger's Ohio Evidence" that this Court also quoted in *Washington*.

properly charged, nevertheless believed the "better practice" was to excuse the jury. *Id.*

The *Washington* majority ultimately agreed with the *Harris* court that the better practice is to excuse the jury, and then decided to "go a step further" and "create a *per se* rule requiring the trial court to conduct a [child] competency hearing in the absence of a jury." *Id.* The majority opined that its prophylactic rule was warranted because conducting child witness competency hearings in the presence of the jury could improperly influence the jury's ability to determine the child witness's credibility, expose the jury to otherwise inadmissible testimony such as hearsay, and suggest the trial judge's endorsement of the child witness's credibility if the witness was deemed competent. The majority also opined that a cautionary charge could be insufficient because a competency proceeding in the presence of the jury "inevitably permeates into the veracity assessment assigned exclusively to the jury." *Id.* at 647.[9]

The *Washington* case does not support appellant's claim that, if his appeal counsel had claimed trial counsel ineffectiveness in failing to object to the competency examination being conducted in front of the jury, there is a reasonable probability that a new trial would have been granted on direct appeal. In *Washington*, this Court decided a preserved question of first impression seven years after appellant's trial and adopted what amounted to a prophylactic rule. Nor can trial counsel be faulted for failing to forward a request for the *per se* rule that the *Washington* majority ultimately devised. On the other hand, there was a basis in the law in 1991 for trial

9. Madame Justice Newman filed a concurring opinion, in which she disagreed with adoption of a *per se* rule and expressed preference for leaving the decision whether to hold a child witness competency examination before the jury within the discretion of the trial judge; Justice Newman would also have required that if the trial court holds the examination before the jury, an explanatory instruction regarding the difference between competency and credibility be issued. 722 A.2d at 647–48 (Newman, J., concurring). This author dissented, opining that the examination should be before the jury, with an appropriate cautionary charge instructing the jury that the court's finding of competency is not an assessment of credibility and that the jury is the sole judge of credibility. 722 A.2d at 648–49 (Castille, J., dissenting).

counsel to request that the court, in its discretion, conduct the competency examination outside the presence of the jury, *see Repyneck, supra,* and there was nothing to prevent counsel from requesting an explanatory charge.[10] For purposes of decision, then, we will assume arguable merit in this underlying layered claim; we agree with the PCRA court, however, that appellant has not proven *Strickland* prejudice.

At trial, the competency examination of N.M. was brief. The prosecutor first asked N.M. whether she knew who the judge was; N.M. answered that she did. The prosecutor asked N.M. to state her age, what grade she was in at school, and what school she attended; she answered these questions. The prosecutor next asked N.M. whether she could tell the difference between the truth and lies, giving examples such as statements that it was snowing inside the room and that N.M.'s dress was a different color than it really was. N.M. answered that she knew such statements would be lies; that she understood that it was bad to tell a lie and good to tell the truth; and that she promised to tell the truth and what she remembered. Defense counsel then asked N.M. if she knew the difference between "a lie and a fairy tale" and that "a story is not real." N.M. indicated that she did know the difference. The court then stated: "I find that [N.M.] is competent and she is capable of having the intelligence and understands the obligation of telling the truth." The competency examination was then concluded and the prosecutor immediately began direct examination of N.M. *See* N.T., 11/7/91, at 7–11.

On direct examination, N.M. testified that she recognized appellant in the courtroom because he had previously been at the apartment where she lived with her mother; she then described the night of the murder. N.M. testified that she

10. This is not to say that there might not be strategic reasons to prefer that the competency examination and determination be made in front of the jury in a particular case. An attorney may believe that it would benefit his client for the jury to observe a witness's performance in a competency qualification. But, no such claim is forwarded by the Commonwealth here, nor do we have any account of trial counsel's subjective thinking in this case.

had been sleeping when she was awakened by "Manny" hitting her mother with a radio, that "Manny" "put an iron on her mother's head" and that her mother had hollered. N.M. testified that she tried to stop "Manny" by hitting him, but he hit her, choked her, and put a pillow over her face, after which she was laying down for a time. She also saw "Manny" hit her mother and put her mother in the bathtub with blood. She went to her neighbor Madeline's after "Manny" left and told Madeline what she had seen. She recalled telling both the doctor at the emergency room and the police that "Manny" had hurt her mother; she also remembered that she had recognized "Manny" in the pictures the police showed her. *See* N.T., 11/7/91, at 11–20.

On cross-examination, counsel impeached N.M. with a prior statement in which she had indicated, in counsel's words, that she "did not see what Manny hit mommy with" whereas she now testified that she had seen "Manny" hit her mother with both a radio and an iron. Counsel also questioned N.M. about her recollection of the night of the murder and noted other inconsistencies between N.M.'s testimony on direct examination and earlier statements, such as whether "Manny" had a knife and whether her mother was in bed when "Manny" entered the apartment. Counsel emphasized prior statements by N.M. indicating that after "Manny" had pulled her mother off the bed, he closed the door to the bedroom, so that N.M. could not have seen what was going on; and that N.M. had gone back to sleep while the bedroom door was closed, had not seen any of the altercation that led to her mother's death, and had not heard her mother crying or screaming. *See* N.T., 11/7/91, at 20–32.

On re-direct, the prosecutor attempted to clarify N.M.'s testimony that she had in fact seen appellant hit her mother. When defense counsel objected, the court asked N.M., "Did you see Manny hit mommy?" and "You did not see Manny hit mommy?" N.M. answered "No" to both questions. When the prosecutor resumed re-direct examination, he elicited testimony from N.M. that she had seen "Manny and mommy" in the room and that "Manny" had a radio and an iron in his hands.

N.M. also testified that she remembered telling the detective after the murder that she had seen "Manny" hit her mother with an iron and pull her mother's hair out. On re-cross examination, defense counsel attempted to further probe whether N.M. actually saw her mother get hit in the head with an iron, but the trial court sustained prosecution objections that the question form was inappropriate and defense counsel declined to pursue the matter any further. *See* N.T., 11/7/91, at 32–37.

Preliminarily, we note that the fact that a child competency examination is conducted in front of the jury is not inherently prejudicial—and certainly not in a heightened *Strickland* sense. The *Washington* Court recognized as much; its *per se* rule was adopted as a prophylactic measure. Nor does appellant claim that there was anything particularly prejudicial about the substance of the brief in-court competency examination and ruling in this case, beyond the bare fact that both the examination, and the court's finding of competency, were placed before the jury. Appellant also does not challenge the court's ruling, *i.e.*, he does not dispute that N.M. in fact was competent to testify. What remains, then, is the fact of the brief examination and the court's finding that N.M. was competent, *i.e.*, that she was "capable of having the intelligence and understands the obligation of telling the truth."

This record does not support a finding that actual prejudice inured to appellant, *i.e.*, that if N.M.'s competency examination and determination had not occurred in front of the jury, the result of the trial would have been different. All witnesses swear or affirm an oath before testifying in front of a jury; the same promise is made by those who are unfailingly honest, and by those who intend to observe their promise only in the breach. Only certain witnesses, including the young, are subject to some additional screening and probing beyond the mere oath or affirmation.[11] It is difficult to see how

11. Although witnesses generally are presumed to be competent in Pennsylvania, *see* Pa.R.E. 601(a), this Court historically has required

neutral questions implicating competency, if otherwise admissible at trial—questions probing the ability to perceive and relate events, the awareness of the duty to speak the truth—such as were posed here, could be deemed prejudicial in the *Strickland* sense.

A court's in-court statement of its finding of competency, of course, can be another matter. But, in this case, the court's ruling was stated in neutral terms: the court spoke only of the child being "capable of having the intelligence and understands the obligation of telling the truth." This ruling did not suggest that the court believed that the child—who had not yet testified—would, in fact, accurately relate events and would tell the truth; rather, the court spoke narrowly of capacity and obligation. Although it is from the mouth of the judge, in substance, this is what adult witnesses convey when they take an oath—even if they intend to violate it.

Furthermore, the actual examination of N.M. plainly conveyed to the jury that her account was subject to question, the same as that of any other witness permitted to testify. Defense counsel cross-examined the child and exposed inconsistencies in her statements and her memory. The trial court itself elicited contradictory answers from the child concerning whether she had seen appellant strike her mother. On this record, it is difficult to discern any prejudice from the in-court competency examination alone, given that these inconsistencies in N.M.'s testimony were exposed immediately after she, unlike other witnesses, was specifically questioned before the jury about her ability to recall and relate the truth.

In assessing the prospect of prejudice, we note also that the trial court made clear to the jury in its general introductory instructions that the jury was the sole judge of witness credibility:

that witnesses under the age of fourteen be subject to judicial inquiry into their testimonial capacity. *See Rosche v. McCoy,* 397 Pa. 615, 156 A.2d 307, 310 (1959); *accord Commonwealth v. Dowling,* 584 Pa. 396, 883 A.2d 570, 576 (2005); *Commonwealth v. Delbridge,* 578 Pa. 641, 855 A.2d 27, 39 (2003).

You are the judge of the credibility and weight of all evidence, including the testimony of witnesses. By credibility of testimony or other evidence, I mean its truthfulness and accuracy.... You are not bound by any opinion you might think counsel or I have expressed concerning guilt or innocence, credibility of witnesses, weight of evidence, facts proven by the evidence or inferences to be drawn from the facts.

N.T., 11/6/91, at 18, 20. The trial court's closing instructions to the jury reiterated these points and added a list of suggestions the jury might consider in deciding witness credibility, including general references that obviously accounted for child witnesses, such as that the jury consider the witnesses' ages, their ability to have observed events, their ability to recollect events, and the extent to which a witness's testimony was contradicted or supported by other testimony and evidence. N.T., 11/12/91, at 60–62. In addition to the fact that trial counsel could rely on these instructions to dispel any possible spillover of prejudice from the in-court competency examination of N.M., the instructions square well with the modest nature of the court's finding on competency which, again, spoke in terms of N.M.'s capacity and obligation, and not her credibility.

Finally, in assessing prejudice and considering whether a different outcome might have ensued, had N.M.'s competency examination taken place outside the presence of the jury, we note that while N.M. was an important eyewitness at trial, her identification of appellant as the killer and her general account of the killing were echoed by adult witnesses who testified as to what N.M. told them shortly after the murder. Madeline Dickerson, the victim's neighbor, testified that the morning after the murder, N.M. came to her door and told her that "Manny" had hit her mother in the head with an iron and put her in the bathtub; N.M. also described to Ms. Dickerson all the blood at the scene. The emergency room doctor who treated the injuries appellant inflicted on N.M. testified from her own notes that N.M. told her: "Manny took me and put me on the bed. He hit mommy. He hit her with a knife, a

big knife from the kitchen. He put my mommy in the bathtub. There was blood all over my mommy. There was blood in her mouth. Manny hit me here [N.M. pointed to her own face]. He hit me this morning." Finally, Detective Paul Rich of the Homicide Division, who interviewed N.M. later that same day, testified that N.M. selected appellant's photograph from a photo array and identified appellant as the one who attacked her mother. N.T., 11/7/91, at 39–41, 57–58, 68–72. Viewed in light of this testimony, appellant's particular assertion that the trial court finding N.M. competent in the jury's presence in some way bolstered N.M.'s credibility to a prejudicial extent is unpersuasive. In light of the foregoing, we conclude that appellant has not established a reasonable probability that, if only the competency examination and ruling had occurred outside the presence of the jury, the outcome of the trial would have been different. Therefore, appellant's underlying claim of trial counsel ineffectiveness fails and, as such, his derivative claim that direct appeal counsel was ineffective for failing to pursue that claim necessarily fails as well.

 Appellant's alternative layered claim concerning trial counsel's failure to request a jury instruction distinguishing between competency and credibility fails for the same inability to prove prejudice. As we have noted above, the court's ruling on competency was modest and narrow; the jury was separately and strongly instructed on credibility, including concerns obviously particular to child witnesses; inconsistencies in the child's testimony were highlighted for the jury; and other evidence corroborated the child's in-court account. Moreover, appellant fails to explain how a specific and additional instruction distinguishing between competence and credibility would have improved his prospects for a different result at trial. And, finally, the cases appellant cites do not support this claim. In *Rosche v. McCoy*, 397 Pa. 615, 156 A.2d 307 (1959), this Court set forth the standard for child witness competency and held that the determination was within the trial court's discretion, but did not suggest a need for specific instructions to the jury, much less did the Court

outline what such an instruction should say. In *Common-wealth v. Roldan*, 524 Pa. 366, 572 A.2d 1214 (1990), which was not a competency case, this Court held that remarks and questions by the trial court to either witnesses or counsel were acceptable when they served the limited purpose of clarification. Notably, in *Roldan*, the trial court instructed the jury both before and at the close of evidence of its role as primary arbiter of credibility—the trial court here did so as well. The *Roldan* Court, declining to find reversible error, held:

> These instructions served to stress to the jurors that it was their opinion and their opinion alone that mattered. That they resolved the credibility of the appellant's theories of defense against him was not the result of questioning from the bench but rather due to the fact that the evidence against this appellant was both overwhelming and credible.

*Id.* at 1216. *Roldan* does not support appellant's claim here.[12]

### D. Failure to request *Kloiber* charge

Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to request a cautionary instruction regarding N.M.'s identification testimony pursuant to *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). Appellant alleges that N.M. wavered during cross-examination and then recanted her testimony that she actually saw appellant hit the victim, which appellant argues should have cast serious doubt on N.M.'s identification of him as the perpetrator. Appellant alleges that the trial court compounded the problem and manifested bias by questioning N.M. on re-direct examination, which appellant says improperly influenced N.M.'s testimony. Instead, appellant argues, the trial court should have *sua*

---

12. Appellant also claims trial court error for failure to instruct the jury *sua sponte* as appellant indicates; any such claim of trial court error is waived for failure to raise it before the trial court. *See* Pa.R.A.P. 302(a); *Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 758 (2005). Even if it is assumed that the trial court had such a *sua sponte* duty at trial, appellant could have raised the claim of supposed trial court error on post-verdict motions and on appeal, but did not, and so the claim is waived under the PCRA.

*sponte* issued a *Kloiber* charge.[13] Appellant further contends that the lighting was poor at the time of the murder, as it was nighttime, and that N.M. was not well-positioned to see what actually happened.

The Commonwealth responds that this claim is meritless because none of the established grounds for a *Kloiber* charge was met. The Commonwealth submits that appellant's claim is really an improper back-door challenge to N.M.'s credibility and is not within the ambit of *Kloiber*, which focuses on the circumstances of the out-of-court event and the actual physical ability of the witness to see and identify a defendant. The Commonwealth posits that N.M. plainly had an opportunity to view appellant, whom she knew well, during the length of the altercation, both when appellant was attacking her mother and when he was attacking her. The Commonwealth maintains that, even if the entirety of the assault was not in N.M.'s direct line of vision at every moment, the fact remains that she was close enough to see and identify appellant clearly during crucial moments in the ordeal. The Commonwealth adds that any uncertainty in N.M.'s testimony did not involve the identity of the attacker, but was limited to certain aspects of the ordeal. But, at no point, the Commonwealth emphasizes, was N.M. equivocal in her unfailing, repeated identification of appellant, whom she knew, as her mother's killer: to her neighbor, to the police, to her treating doctor, from a photographic array, at the preliminary hearing, and at trial. As there was no basis for a *Kloiber* instruction, the Commonwealth asserts, appellant cannot prove his layered claim of counsel ineffectiveness. ˵

The PCRA court agreed that the trial record here did not support a *Kloiber* instruction. The court noted that N.M. knew appellant personally prior to the incident, adding that because N.M. was also physically attacked during the incident, logic suggests that she must have been close enough to the perpetrator to recognize him. The court further noted that

13. To the extent appellant suggests a *sua sponte* duty of the trial court to issue the charge, any such claim again is waived for the same reasons set forth in footnote 12, *supra*.

the record indicated that there was sufficient light in the apartment for an identification. The court added that at no time had N.M. ever indicated that someone else was responsible for the attack, nor had she wavered in her identification of appellant as the perpetrator. Thus, the court concluded, trial counsel was not ineffective for failing to request a *Kloiber* charge and direct appeal counsel was not ineffective for failing to raise trial counsel's ineffectiveness in this regard.

Under *Kloiber*, "a charge that a witness'[s] identification should be viewed with caution is required where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past." *Commonwealth v. Gibson*, 547 Pa. 71, 688 A.2d 1152, 1163 (1997) (citing *Kloiber*). Where an eyewitness has had "protracted and unobstructed views" of the defendant and consistently identified the defendant "throughout the investigation and at trial," there is no need for a *Kloiber* instruction. *Commonwealth v. Dennis*, 552 Pa. 331, 715 A.2d 404, 411 (1998). When the witness already knows the defendant, this prior familiarity creates an independent basis for the witness's in-court identification of the defendant and weakens ineffectiveness claims based on counsel failure to seek a *Kloiber* instruction. *See Commonwealth v. Fisher*, 572 Pa. 105, 813 A.2d 761, 770–71 (2002) (Opinion Announcing Judgment of the Court) (witness's in-court identification valid based on witness having known defendant for eleven years); *Commonwealth v. [Freddie] Johnson*, 433 Pa. 34, 248 A.2d 840, 841–42 (1969) (witness had known defendant for three years prior to robbery and murder; no trial court error in not issuing *Kloiber* instruction); *see also Commonwealth v. [Clarence] Johnson*, 419 Pa.Super. 625, 615 A.2d 1322, 1335–36 (1992) (witness knew defendant and "had seen him on several occasions" prior to murder; defendant not entitled to *Kloiber* instruction because witness's in-court identification was supported by independent basis).

Appellant has not shown that any of the three disjunctive *Kloiber* circumstances was present here; thus, his underlying

claim that counsel's performance was deficient lacks arguable merit. Although N.M. may not have witnessed the entirety of the attack upon her mother, particularly its grisly conclusion, she was present for enough of it—including when she herself was also attacked by appellant—to identify him as the perpetrator, especially since there is no disputing that she knew appellant already.[14] In addition, although N.M.'s testimony under cross-examination was uncertain as to some specific details of the killing, she never equivocated in her identification testimony, nor did appellant demonstrate any issue with N.M.'s prior identifications of him as the assailant. Furthermore, N.M.'s testimony established that she had protracted and unobstructed views of appellant during crucial parts of the attack, especially when she went to see what was happening to her mother and appellant attacked her. Any perceived weaknesses in N.M.'s testimony attributable to her tender years, the circumstances of the horrific experience, the subject matter, and her ability to recall details were matters of credibility for the jury as factfinder to decide; but those issues did not undermine N.M.'s actual physical ability to identify appellant at the time and place of the murder, so as to trigger the special identification testimony concerns underlying the *Kloiber* line of decisions. Accordingly, appellant's layered claim concerning the absence of a *Kloiber* charge fails.

### E. Failure to challenge absence of medical examiner's testimony

Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to adequately challenge the Commonwealth's

---

14. On direct examination, N.M. initially indicated that she had seen "Manny" in the courtroom earlier that day (appellant had since been removed, upon his own request in open court before the jury, to the robing room, where he watched the proceedings on closed circuit television). N.T., 11/7/91, at 7, 13. Thereafter, N.M. answered "Yes" when asked "Did [Manny] ever come there?" with regard to the apartment where N.M. lived with her mother (the victim), younger brother, and baby sister. *Id.* at 13. Joan Walker and Aaron Casper, adult witnesses who knew both appellant and the victim, also testified that appellant had actually stayed at the victim's apartment some time prior to the murder. *See* N.T., 11/6/91, at 39, 54.

failure to produce at trial Fredric N. Hellman, M.D., the medical examiner who performed the autopsy on the victim and drafted the autopsy report. Appellant argues that his counsel's default denied him his constitutional right to confrontation, which he asserts he preserved at trial by refusing to stipulate to Dr. Hellman's testimony.[15]

Appellant relatedly alleges that trial counsel was ineffective for failing to adequately challenge the trial court's error in permitting the deputy medical examiner, Ian C. Hood, M.D., to testify as to the cause of the victim's death. Appellant recognizes that Dr. Hellman did not testify at trial because he had since become a medical examiner at the Armed Forces Institute of Pathology outside of Washington, D.C. But, appellant claims that this circumstance was not sufficiently compelling to justify Dr. Hellman's absence. Appellant relies upon *Commonwealth v. McCloud*, 457 Pa. 310, 322 A.2d 653 (1974). Appellant acknowledges that trial counsel objected to Dr. Hood testifying in lieu of Dr. Hellman, but claims that counsel should have extended the challenge by moving for a mistrial.

The Commonwealth responds that appellant's claim lacks arguable merit. The Commonwealth notes that Dr. Hood was present during the victim's autopsy and supervised the procedure; he personally viewed the victim's body repeatedly; he reviewed the case with Dr. Hellman both before and after the autopsy; and he testified at trial as to his own observations, opinions, and conclusions. The Commonwealth also argues that because Dr. Hood was cross-examined in detail by appellant's trial counsel, there was no violation of appellant's con-

15. Appellant adds that direct appeal counsel was independently ineffective for failing to challenge the trial court's erroneous failure to "inject itself" *sua sponte* on appellant's behalf when trial counsel allegedly failed to protect his confrontation right. This claim of underlying trial court error in failing to discharge a supposed *sua sponte* duty differs from the *sua sponte* trial error claims appellant has raised above and which were addressed in footnotes 12 & 13, *supra*. In this instance, appellant seems to suggest that the claim was available to direct appeal counsel, but was defaulted at that level. As with the *"sua sponte"* allegations appended to his prior claims, appellant has identified no authority—for there is none—for his assertion that the trial judge was obliged to take this action without request from the defense, and so the underlying claim is waived.

frontation rights. The Commonwealth cites two cases where a pathologist and a medical examiner were permitted to testify even though, unlike here, the respective witnesses had not even personally examined the victims' bodies: *Commonwealth v. Smith,* 480 Pa. 524, 391 A.2d 1009, 1012–13 (1978), and *Commonwealth v. Mitchell,* 391 Pa.Super. 100, 570 A.2d 532, 534 (1990). In the Commonwealth's view, *McCloud* is inapposite because in that case, the prosecution attempted to prove the cause of death by simply entering the autopsy report on the basis that the report was admissible under the business records exception to the hearsay rule. In short, the Commonwealth asserts that here, it presented a live witness at appellant's trial—the supervising medical examiner of the autopsy—who had observed the procedure, drawn his own conclusions as to the victim's cause of death, and was subject to cross-examination by the defense. Furthermore, the Commonwealth contends, appellant has not established: that Dr. Hellman would have testified differently; that Dr. Hood's testimony was in error; or even that a different cause of death was possible, given that the victim was found in a bloody bathtub with fluid in her lungs and pulmonary edema. The Commonwealth adds that since appellant's trial counsel did in fact object to Dr. Hood's testimony, his ineffectiveness on this point cannot be established; nor, similarly and derivatively, can direct appeal counsel be found ineffective.

The PCRA court held that because Dr. Hood was present at and supervised the victim's autopsy, he testified as to his own observations, opinions, and conclusions. The court also concluded that *McCloud* was inapposite and that appellant had not shown actual prejudice. We see no error in the ruling below. *McCloud,* indeed is inapposite. In that case, this Court held that the Commonwealth's attempt to read into evidence certain portions of the medical examiner's autopsy report was not permissible under the business records exception to the hearsay rule and that without the examiner's testimony, reversible error had occurred. This Court noted that, in the criminal context, medical information may be admissible under the business records exception for the "legit-

imate purpose of establishing the fact of hospitalization and the treatment given," but not to prove medical opinion as to an essential element of a crime, such as the cause of death. 322 A.2d at 656 (quoting *Commonwealth v. Mobley*, 450 Pa. 431, 301 A.2d 622, 624 (1973)).

The two cases cited by the Commonwealth are more relevant. In *Smith*, the defendant argued that the Commonwealth did not lay a proper foundation for testimony as to cause of death by a pathologist who had not been present at the gunshot victims' autopsy and had not seen the bodies personally, but who had inspected the victims' vital organs after the fact and had also relied upon the autopsy report of the deputy coroner who had performed the autopsies. The deputy coroner also testified, but limited his testimony to his qualifications and the facts he observed in performing the autopsies and did not supply any medical opinions. This Court concluded that the deputy coroner was qualified to produce a report based upon the facts he observed during the course of the autopsies. Moreover, and to the point here, this Court held that the report, in combination with the pathologist's own observations of the gunshot victims' vital organs, was a proper basis from which the pathologist could draw conclusions with a reasonable degree of medical certainty as to the cause of death. 391 A.2d at 1012–13. Similarly, in *Mitchell*, the Superior Court rejected a Confrontation Clause challenge where the examiner who prepared the autopsy report had moved out of the country and was not available to testify, but the examiner who did testify relied upon the facts presented in the report and from them drew his own conclusions as to the cause of death. *See* 570 A.2d at 534.

In this case, Dr. Hood testified as follows during direct examination:

Q: During the period, on the day in fact when Miss Manigault was brought to the Medical Examiner's Office for postmortem examination, did you have an opportunity to view the body?

A: Yes.

Q: Did you supervise the postmortem examination which was in fact performed by Dr. Hellman, who was a fellow at that time?

A: I was present and looked over the case as he did it. The attending pathologist at the Medical Examiner's Office who was assigned for signing out cases that day was Dr. Hoyer, and his signature appears at least one place in this report. The principle [sic] person who did the autopsy was in fact Rick Hellman.

\* \* \*

Q: Have you had an opportunity since that time to review both the slides, all the appropriate documents and all the materials that are involved in the postmortem examination of Sheila Manigault?

A: Yes. I went over this case with him before the autopsy and after.

Q: After speaking with Dr. Hellman and reviewing the appropriate documents, did you view the slides as well?

A: Yes.

Q: Viewing the slides, were you able to reach an opinion to a reasonable degree of medical certainty as to the cause of death of Sheila Manigault?

[Defense counsel objected and was overruled by the court.]

A: I have no doubt that this lady died, as is documented here, from the effects of being beaten, scalded and finally drowned.

N.T., 11/7/91, at 83–85. Dr. Hood also indicated in his testimony that a great many of the injuries inflicted on the victim had occurred before her death. See id. at 86–88, 93–94. Dr. Hood further noted that he lacked an independent specific recollection of every detail of this particular autopsy, in light of the fact that six other autopsies were occurring at the time, but that the autopsy was "sufficiently unusual that it sticks in my mind." N.T., 11/13/91, at 17.

In light of the testimony above and the decisions in *Smith* and *Mitchell*, which held that a medical expert who did not perform the autopsy may testify as to cause of death as long

as the testifying expert is qualified and sufficiently informed, appellant's claim that trial counsel should have requested a mistrial lacks merit. Dr. Hood, who was qualified to render an opinion on cause of death, viewed the victim's body personally and consulted with Dr. Hellman both before and after the autopsy itself. Moreover, this circumstance is a far cry from *McCloud*, upon which appellant bases his claim. We also agree with the PCRA court that appellant has not shown *Strickland* prejudice. He has not shown that Dr. Hellman's testimony would have differed from that of Dr. Hood at all, or that cross-examination of Dr. Hellman would have revealed such different information that there is a reasonable probability of a different verdict. Instead, appellant confines himself to the procedural aspects of his complaint. Because appellant has not established ineffective assistance of trial counsel, his derivative claim of ineffective assistance of direct appeal counsel similarly fails.

### F. Failure to object to prosecutor's motive argument

 Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to challenge the Commonwealth's alleged misrepresentation of the evidence when characterizing appellant's motive for committing the murder. Appellant argues that the Commonwealth's portrayal of him as having been put out of the house by the victim and then rejected by another woman, Joan Walker, and the insinuation that these circumstances led him to murder the victim, was speculation without any basis in the record. Appellant points to the cross-examinations of Joan Walker and Frank Casper, in which both testified that appellant never threatened them or anyone else, to their knowledge.

The Commonwealth responds that ample record evidence supported the trial prosecutor's characterization of appellant's motive, including other aspects of Ms. Walker's and Mr. Casper's testimony. The PCRA court did not address this issue in its opinion.[16]

16. The Commonwealth argues that appellant never raised this claim in any of his various amended PCRA petitions. It appears that appellant

The standards governing challenges to statements by the prosecutor are well-settled:

> A prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. A challenged statement by a prosecutor must be evaluated in the context in which it was made. Not every intemperate or improper remark mandates the granting of a new trial. Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 668 (2007) (citations omitted). Prosecutor remarks are not objectionable if the remarks "were based on the evidence or proper inferences therefrom. . . ." *Commonwealth v. [Aaron] Jones*, 571 Pa. 112, 811 A.2d 994, 1006 (2002). On the other hand, of course, the prosecutor should not "misstate the evidence or mislead the jury as to the inference it may draw." *Commonwealth v. Shain*, 493 Pa. 360, 426 A.2d 589, 591–92 (1981) (disapproving prosecution commentary suggesting that defendant intended to molest decedent-victim; setting of crime did not exclude that possibility, but evidence did not support inference of motive); *see also Commonwealth v. Adkins*, 468 Pa. 465, 364 A.2d 287, 290 (1976) (prosecution's motive argument based solely upon witness's speculative statement found to be insufficiently supported by evidence).

Here, the prosecutor stated during his opening remarks that the victim had allowed appellant to stay at her apartment when he had nowhere else to go, but that shortly thereafter, she wanted him to leave and told this fact to her neighbor Frank Casper, who helped the victim "put [appellant] out" by

did in fact raise this issue in his May 30, 2002 "Fourth Supplement" to his amended PCRA petition at ¶¶ 195–204. Because we find that the claim is resolvable on the record, we proceed to decide it even though it was not addressed by the PCRA court.

allowing appellant to stay with him in his apartment with Joan Walker for a few days. The prosecutor continued by noting that appellant did stay at least one night with Casper and Walker, but that very soon thereafter, Ms. Walker "didn't want [appellant] around anymore, either. He was starting to give her a bad feeling." *See* N.T., 11/6/91, at 24–27. In closing, the prosecutor reiterated that the victim had "taken in" appellant but that he had become "so threatening to her that she had to put him out." The prosecutor stated next that while the Commonwealth is not obligated to prove motive, if one exists, the jury should consider it, and that along those lines, appellant "had been put out by a woman, scorned by a woman who wouldn't even speak to him and that malice, that hostility, that anger was in him." N.T., 11/12/91, at 39.

Appellant's claim that there was no evidence to support the prosecutor's comments regarding motive is belied by the record. Frank Casper testified that he allowed appellant to stay with him for a few nights because the victim had told him that she did not want appellant staying with her. N.T., 11/6/91, at 55. Although Ms. Walker testified on cross-examination that appellant never actually threatened her, her testimony on direct examination indicated clearly that appellant scared her and that she sought to avoid him, going so far one time as to punch him and push a friend's apartment door closed on him in an effort to stay away from him after he had followed her. N.T., 11/6/91, at 39, 41, 42, 45, 49. This testimony supported the prosecutor's statements suggesting appellant's possible motive for killing the victim. The prosecutor's remarks were a fair inference from the evidence and were not excessive or incendiary. The jury was also instructed both at the beginning and at the end of trial that the arguments of counsel were not to be taken as evidence. N.T., 11/6/91, at 20; 11/12/91, at 54. In light of the foregoing, trial counsel cannot be faulted for failing to object to the prosecutor's remarks, and thus, appellant's claim lacks arguable merit. Moreover, appellant has not shown that had trial counsel objected, the trial outcome would have been different, such that appellant was prejudiced by the prosecutor's opening and

closing comments suggesting motive. Because appellant has not established ineffective assistance of trial counsel, his derivative claim of ineffective assistance of direct appeal counsel necessarily fails.

## G. Failure to object to verdict slip

 Appellant next faults direct appeal counsel for failing to claim that trial counsel was ineffective for failing to request that the trial court include a separate line on the verdict slip of overall "not guilty," in addition to the guilty/not guilty option presented to the jury for the various charges individually. Appellant argues that since he formally pleaded not guilty, the lack of a global "not guilty" option on the verdict slip violated due process. Appellant notes that the prosecutor suggested inclusion of such a "not guilty" option as a precaution against claims of prejudice by appellant, but that the court declined the suggestion, without objection by appellant's counsel. Citing *Commonwealth v. Edwards*, 394 Pa. 335, 147 A.2d 313 (1959), appellant speculates that the jury may not have believed that it was empowered to simply acquit him.

 Appellant adds that the verdict slip deficiency was compounded by the fact that the jury received misleading information from the court crier [17] after the jury left the courtroom to begin deliberations. Appellant cites to a record exchange during which the court crier said, respecting the murder charges: "When I give the verdict sheet, I explain to them [the jury] they can only select one of the two options, either first degree or third degree." Citing *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), appellant argues that the court crier probably confused the jury regarding its ability to find appellant not guilty and that the jury was likely misled to an extent that could not have been countered by the court's instructions on the concepts of burden of proof and the presumption of innocence.[18]

17. Appellant refers to the court crier as a "bailiff," but we will employ the proper term.

18. Appellant also faults trial counsel for failing to request a jury instruction that a global "not guilty" verdict was possible and for

The Commonwealth responds that the trial court instructed the jury properly as to its ability and duty to find appellant "not guilty" if the Commonwealth did not meet its burden of proof. The Commonwealth notes also that the verdict slip properly listed "not guilty" as a possible verdict for both the first-degree and third-degree murder charges and that appellant has not shown that the jury was mistaken or confused in its completion of the verdict slip. The Commonwealth argues that *Edwards* is inapplicable because the trial judge there omitted "not guilty" from the list of possible verdicts, which was not so here. The Commonwealth adds that appellant confuses the nature of the discussion between the prosecutor and the trial court regarding the verdict slip. In actuality, the Commonwealth explains, the prosecutor had merely expressed concern, ultimately unfounded, that the layout of the jury verdict slip might lead the jury to believe that it could return convictions of both first-degree murder and third-degree murder, not just one or the other. Concerning appellant's claims as to the court crier, the Commonwealth distinguishes *Parker* as having presented obviously improper conduct by the bailiff, who told several jurors that the defendant was "wicked" and "guilty" and that "[i]f there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." Commonwealth's Brief at 34 (citing *Parker*, 385 U.S. at 363–64, 87 S.Ct. 468). Here, the Commonwealth notes, court personnel did not comment on appellant's guilt, nor was the jury precluded from rendering a not guilty verdict if it had seen fit to do so.

The PCRA court opined that appellant's claim respecting the court crier was not raised in any of his PCRA filings, so any such claim was waived. In a footnote, the court added that while appellant had raised "an issue involving the verdict slip" in his May 2002 Fourth Supplemental and Amended

making statements during jury selection and in closing that, appellant says, amounted to a concession of appellant's guilt. Appellant noted these sub-claims in his Fourth Supplemental and Amended Petition, filed 5/30/02, at ¶¶ 206, 211. However, neither appellant's *pro se* Rule 1925(b) statement nor the Federal Defender's statement mentions these sub-claims and the PCRA court did not address them. Accordingly, these claims are waived.

Petition, he had not raised in that pleading "any of the issues set forth above" (referring presumably to appellant's claim regarding the court crier).[19] In the alternative, on the merits, the court opined that appellant had not established any improper contact between the court crier and the jury. As such, the court concluded, all derivative claims of counsel ineffectiveness associated with the issue of the court crier's conduct were also meritless. The court did not specifically address the merits of appellant's claim alleging layered ineffectiveness arising from the alleged defect in the verdict slip. PCRA Ct. Op. at 27.

The record reveals the following with respect to appellant's underlying complaints concerning the verdict slip and the court crier. First, the trial court defined both first-degree murder and third-degree murder for the jury and set forth in depth the distinct *mens rea* requirement for each. After describing the lesser charges against appellant, the trial court explained that appellant was presumed innocent, that the Commonwealth bore the burden of proving all elements of the crimes beyond a reasonable doubt, and that "if the Commonwealth's evidence fails to meet its burden, then your verdict must be not guilty." N.T., 11/12/91, at 42–44, 50–52.

The verdict slip given to the jury, which is titled "Verdict Report Form," reads as follows:

*Possible Verdicts*:

19. In fact, our review of the record reveals that appellant did raise a claim pertaining to the court crier, as well as the alleged deficiency of the verdict slip, in his May 2002 Fourth Supplemental and Amended Petition at ¶¶ 205–17. Appellant asserted ineffective assistance of trial counsel for failure to object to the court crier's "erroneous directives to the jury concerning the constitutionally infirm/deficient verdict slip (options), while simultaneously failing to request trial court, for appropriate instruction to go out to the jury." *Id.* at ¶ 217. Furthermore, the Federal Defender's Rule 1925(b) statement challenged the conduct of the court crier, overlarding the claim with an allegation of layered ineffectiveness, while appellant's *pro se* Rule 1925(b) statement sought relief on the basis that "trial court officials restricted [the] jury's possible conclusion to a number of verdict options which excluded not guilty." Federal Defender's Rule 1925(b) statement, 4/12/04, at ¶ 12; appellant's *pro se* Rule 1925(b) Statement, 4/26/04, at ¶ 11. Accordingly, we will proceed to the merits of these layered sub-claims, which we find are resolvable on the record.

Murder—1st Degree

Guilty or Not Guilty

 or

Murder—3rd Degree

Guilty or Not Guilty

Possessing Instruments of Crime—Generally

Guilty or Not Guilty

Aggravated Assault (victim: N.M.)

Guilty or Not Guilty

Verdict Report Form, 11/12/91. Thus, the verdict slip specifically reserved the option of guilty or not guilty with respect to each charge. After the jury had retired to deliberate, the court asked if there were "any additions or corrections to the verdict slip." The following exchange then occurred:

**Court:** Are there any additions or corrections to the verdict slip?

**Assistant District Attorney ("A.D.A."):** The only thing I would suggest, if [the court crier] will alter it, as I have seen in the past for the murder bills, it says one of the above verdicts, guilty, guilty murder first degree, guilty murder third degree, not guilty.

**Court:** Let me see that.

**A.D.A.:** It would require them [the jury] actually—for instance, if they acquit the defendant, they would have to find him not guilty of first, not guilty of third. In the alternative they may find the defendant guilty of first and third degree murder, and to me it just seems simpler and more straightforward if the verdict slip says one of the above three verdicts.

**Court** [presumably directed to the court crier]: [T]he Commonwealth has requested the verdict slip be altered to read, "You may select one of the possible three verdicts."

**Court Crier:** The jurors know that. When I give the verdict sheet, I explain to them they can only select one of the two options, either first degree or third degree. That is explained to the jurors.

**A.D.A.:** I understand that, but as I say again, that verdict slip doesn't have one line for not guilty. They could require them to circle not guilty—I don't want any claim of prejudice to arise against the defendant.

**Court:** This verdict slip as written by [the court crier] has withstood the test.

**Court Crier:** It has "or," "first or [third]."

**Court:** That is correct. I'll leave it the way it is.

N.T., 11/12/91, at 62–64. Appellant's counsel raised no objection.

When the jury returned and announced its verdict of guilt, it had executed the verdict slip as follows: the jury wrote the word "guilty" in the blank after first-degree murder; left empty the blank after third-degree murder, and wrote the word "guilty" in the blanks after both possession of an instrument of crime and aggravated assault on N.M.

■ Appellant's claim that counsel was obliged to object to the verdict slip, and to forward an argument along the lines of the suggestion made by the trial prosecutor, lacks merit. First, it must be remembered that the verdict slip exists to record the result of the jury's deliberation; it is not the deliberation itself, and the jury's deliberation is guided by the court's charge. The verdict slip here, as drafted and as executed by the jury, was consistent with the trial court's charge and instructions to the jury. Thus, contrary to appellant's assertions, the verdict slip made clear that a "not guilty" verdict was available as to each of the charges. Although offering the jury a global "not guilty" option is possible, nothing in the law requires that sort of redundancy on the verdict slip, and counsel could trust in the court's charge as well as the fact that the slip made clear that individual not guilty verdicts were available. Furthermore, it is difficult to discern any prejudice arising from the lack of a global "not guilty" option on the verdict slip. Notably, there was no communication from the jury to the court during its deliberations indicating any confusion or difficulty. Any claim of

prejudice arising from the verdict slip rests on pure speculation.

The *Edwards* case appellant cites in challenging the propriety of the verdict slip does not advance his claim. The dispute in *Edwards* did not involve a verdict slip, but rather the more important issue of the accuracy of the trial court's instructions regarding possible verdicts. Edwards admitted shooting his friend's abusive father (who survived the shooting), but claimed insanity. The trial court instructed the jury that it could find Edwards guilty of first-degree murder with the death penalty, first-degree murder with life imprisonment, second-degree murder, voluntary manslaughter, or not guilty because of insanity. However, the jury instruction did not present the option of a simple not guilty verdict. This Court reversed and ordered a new trial, concluding that even though Edwards had admitted the shooting, he was still entitled to the presumption of innocence and it was for the jury to decide whether he had a justification or excuse for the shooting such that outright acquittal was appropriate. *Edwards* reaffirms the importance of accuracy in the court's charge.

In this case, it is undisputed that the court's instructions made clear that a verdict of not guilty was available. Moreover, as noted, the verdict slip itself made clear the availability of a not guilty verdict on each charge. Because appellant's underlying claim challenging the verdict slip lacks merit, counsel cannot be deemed ineffective.

 Appellant's claim regarding the court crier warrants closer analysis, though not necessarily for the reason appellant specifies. A court crier's responsibilities are properly limited to logistics and purely ministerial functions, such as escorting the jury in and out of the courtroom. Instructions on the law, and the deliberative process, should come from the court alone, and should be on the record. The verdict slip falls in a gray area. As noted, the slip is intended merely to record the result of the jury's substantive deliberation. Nevertheless, the fact remains that the slip is with the jury during deliberations, and it should be accurate, so as not to mislead,

just as special interrogatories should be carefully considered for accuracy and usefulness before submission in a civil case. Given this fact, the better course is for the trial court to explain to the jury, in open court and on the record, the mechanics of recording its verdict on the jury slip. That instruction should not be delegated to a court officer, particularly where the communication is off the record. Our review of the court's charge to the jury here reveals no discussion of the verdict slip. *See* N.T., 11/12/91, at 42–62. Unfortunately, it appears, the court here left it to the court crier to distribute and explain the slip. For the reasons set forth above, we caution against that practice.

Turning to the substance of the court crier's off-the-record interaction with the jury concerning the verdict slip, the court crier's account could indeed be problematic—which confirms our concern that such a task should not be delegated to a court officer. If the court crier meant to convey that he had informed the jury that it was to render a verdict on only one of the murder "options" on the verdict slip, that advice would be accurate only for purposes of recording a murder **conviction;** an acquittal on both murder charges would require the jury to pass upon both charges, and the slip should be executed to reflect verdicts on both charges. But, the court crier's account was posed in response to the trial court noting the prosecutor's concern that it would be simpler if the jury were told that it could render one of three possible verdicts on the murder charges (*i.e.,* guilty of first-degree murder, guilty of third-degree murder, or not guilty of either). Notably, the court crier began his response by saying, "[t]he jurors know that," and then recounting that he had informed the jurors that they could only choose first-degree or third-degree murder, which, presumably, was the court crier's way of addressing the conviction scenario.

Counsel obviously could have lodged an objection at this point, pursued the matter further with the court crier on the record, and/or asked for supplemental instructions from the court itself concerning execution of the verdict slip. At a minimum, an objection would have afforded the prospect of a

better record concerning exactly what the jury was told out-of-court. Nevertheless, we do not believe appellant has proven the *Strickland* prejudice he alleges on this record.

Appellant speculates that the court crier's comment to the jury that "they can only select one of the two options, either first degree or third degree" was harmful because it confused the jury into believing that it could not render a verdict of not guilty. But, given the context of the exchange we have set forth above, it is not clear that that is what the crier conveyed to the jury; it is just as likely that all he conveyed was that any recorded guilty verdict for murder had to be limited to first-degree or third-degree murder, and not both. More importantly, appellant's suggestion of juror confusion during deliberation over the availability of a "not guilty" verdict on both murder charges conflates the verdict slip with the court's charge. As noted above, the verdict slip exists merely to record the jury's conclusion after it has deliberated. The verdict slip does not frame deliberations; the court's charge does. Nothing in the truncated explanation of the court crier, or in appellant's proffer, suggests that the court crier's communication with the jury, concerning the mere logistics of recording the verdict on the slip, affected the court's charge or the actual deliberative process of the jury.

Furthermore, for purposes of prejudice analysis on collateral review, the fact remains that the court's charge and the verdict slip both made clear to the jury the availability of a verdict of "not guilty" as to each charge, the jury indicated no confusion with its task, and its verdict as announced was clear and unambiguous. There has been no showing of actual prejudice arising from the trial court's admittedly unfortunate practice of permitting the court crier to explain the logistics of executing the verdict slip. Thus, appellant's layered claim of counsel ineffectiveness fails.[20]

**20.** This case obviously is distinguishable from *Parker, supra,* upon which appellant relies. In *Parker,* the court officer offered several jurors his gratuitous opinion of the defendant's guilt and then compounded matters and undermined the seriousness of the jury's obligation by suggesting that if they convicted the defendant in error, the

## H. Failure to present alibi defense

Appellant next claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to investigate, develop, and produce alibi evidence. Appellant acknowledges that his alibi witness, David El, died before trial,[21] but argues that El had given a signed statement to police detectives James Dougherty and Paul Raley, who also signed the statement as witnesses, which supported an alibi. El's statement indicated that he was at home asleep on the morning of the murder when appellant, whom he called "Manny," knocked at about 6:00 a.m. and asked to stay.[22] Appellant had stayed overnight at El's home in the past. El let appellant in and appellant fell asleep on the couch. Several hours later, while appellant was still there, El went to a bar nearby, where he learned that the victim had been murdered and that the police were looking for appellant. El returned to his home, told appellant that the police were looking for him and asked appellant to leave. Appellant left and El did not see him again before speaking to police detectives later that month.

Supreme Court would correct the mistake. The prejudice in *Parker* was apparent; such is not the case here.

21. It is not clear precisely when El died. Both sides refer in their briefs to a death certificate that appellant apparently attached to his September 2001 PCRA filing that fixed El's death as occurring on July 19, 1990. This would have been several months after the murder and over a year prior to appellant's November 1991 trial. The death certificate, however, does not appear to be in the official record on appeal. At any rate, there is no dispute that El died prior to trial. *See* Commonwealth's Brief at 35.

22. The Commonwealth notes that the version of El's statement included in appellant's PCRA petition appears to have been altered because it indicates that appellant arrived at El's residence between 5:00 a.m. and 6:00 a.m., an hour earlier than the time reflected on the copy of the same document attached by the Commonwealth to its April 19, 2002 Motion to Dismiss. Appellant responds that the alteration he made should be disregarded since his petition agreed with the affidavit of probable cause for his arrest warrant, which stated that appellant arrived at El's at about 6:00 a.m. and left at about 11:00 a.m. Although we obviously do not approve of the alteration of the document, we will proceed to the merits of the claim based upon the un-doctored version of El's statement.

Appellant interprets El's statement as proving that he was with El in El's home at the approximate time the Commonwealth alleged that the murder occurred.[23] Appellant asserts that he informed trial counsel that he wished to assert an alibi based on El's statement and that El's statement was available to trial counsel, but counsel did not pursue the alibi. Citing *Commonwealth v. Toth*, 455 Pa. 154, 314 A.2d 275 (1974), appellant contends that El's statement was admissible, notwithstanding his unavailability to testify at trial, merely to prove that a potentially exculpatory statement was made and not for the truth of the matter asserted in the statement. Appellant also contends that counsel should have called Detectives Dougherty and Raley to testify to their opinions of the reliability of El's statement. Finally, appellant layers his claim by alleging direct appeal counsel ineffectiveness for failing to raise trial counsel's failure to pursue this alibi.

The Commonwealth responds, first, that appellant's current theories arguing that El's statement was admissible under *Toth*, either as proof that an exculpatory statement was made or through the testimony of the police detectives, were not raised in any of appellant's various PCRA petitions and are therefore waived. Commonwealth's Brief at 36 (citing *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1041 (2007) and *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 170 (1999)). The Commonwealth also argues that these waived theories lack merit; we need not reach that point because we agree with the Commonwealth's primary argument that these particular sub-theories have not been preserved. Appellant did not cite *Toth* in any of his PCRA petitions or amendments. Appellant's *pro se* Rule 1925(b) statement (at ¶ 8) and the Federal Defender's Rule 1925(b) statement (at ¶ 34) both

23. Dr. Hood testified for the Commonwealth that, in his opinion, the victim had been dead for six to twelve hours, and perhaps as long as sixteen hours prior to when he and Dr. Hellman examined the body initially at about 4:00 p.m. later in the day after the victim was found. Roughly speaking, then, Dr. Hood placed the victim's time of death as occurring between 4:00 a.m. and 10:00 a.m. that morning, but perhaps as early as midnight, although the "further back you go the less certain the ability to determine time of death becomes." *See* N.T., 11/7/91, at 95–97.

identify the claim as premised on allegations that trial counsel failed to investigate and develop alibi evidence, but both statements frame the issue in general terms and do not mention *Toth* or the theory that the police could testify to a hearsay statement's reliability. Thus, these sub-claims are waived.

On the merits of appellant's general ineffectiveness/alibi claim, the Commonwealth argues that appellant's theory that El's out-of-court statement establishes an alibi clearly entails use of El's statement for the truth of the matter asserted, which is prohibited hearsay under Pennsylvania Rules of Evidence 801, 802, and 804. The Commonwealth posits that the only potentially applicable hearsay exception would be Rule 804(b)(3), "statement against interest," in which case the police detectives' testimony might be admissible to corroborate the statement's trustworthiness. But, according to the Commonwealth, El's statement was clearly not against El's interest and there is no other basis for its admissibility. Commonwealth's Brief at 36–37.

More fundamentally, the Commonwealth argues, El's statement that appellant was at his apartment on the morning of the murder from about 6:00 a.m. or 7:00 a.m. until after 10:00 a.m. does not qualify as alibi evidence. This is so because the evidence would not conclusively exclude appellant as the murderer since, according to Dr. Hood's testimony, the killing occurred between 4:00 a.m. and 10:00 a.m., and perhaps even as early as midnight. That time frame left sufficient time for appellant to both commit the murder and appear at El's residence afterwards. The Commonwealth also notes that several aspects of El's statement would have been harmful to appellant even if the statement was admitted, including: El's assertion that it was unusual for appellant to appear at his home in the early morning; that appellant's appearing at that time gave El a feeling "that something had happened"; and El's description of suspicious conduct on appellant's part, including that when El told appellant that the police were looking for him, appellant did not inquire as to a reason, but simply left El's apartment; and that appellant "disappeared"

and had no contact with El after the attack on the victim became known. Thus, the Commonwealth argues, even if El's statement had been admitted and credited, it was not reasonably likely to have convinced the jury to overlook the Commonwealth's substantial evidence of appellant's guilt.

The PCRA court concluded that appellant's underlying claim premised upon El's statement as an alibi was meritless because El's death prior to trial made his statement inadmissible hearsay. PCRA Ct. Op. at 46 (citing *Commonwealth v. Sims*, 513 Pa. 366, 521 A.2d 391 (1987)) (written out-of-court statements of eyewitnesses inadmissible hearsay when witnesses cannot be found to testify).[24] We agree.

"Hearsay, which is a statement made by someone other than the declarant while testifying at trial and is offered into evidence to prove the truth of the matter asserted, is normally inadmissible at trial." *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 254 (2006); *See* Pa.R.E. 801(c) & 802. Of course, out-of-court statements by an unavailable declarant may be admissible if they fit within one of several recognized hearsay exceptions, such as former testimony, a statement under belief of impending death, a statement against interest, or a statement of personal or family history. *See* Pa.R.E. 804. In the alternative, out-of-court statements may be admissible because they are non-hearsay, in which case they are admissible for some relevant purpose other than to prove the truth of the matter asserted. *See Commonwealth v. [Raymond] Johnson*, 576 Pa. 23, 838 A.2d 663, 680 (2003) (defendant's statements threatening witness's family admissible as verbal acts, a form of non-hearsay, because evidence not offered to establish truth of matter asserted, but rather, to demonstrate fact of attempted influencing of witness); *Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999) (statements by witness who overheard defendant and his brother (the victim) arguing were admissible as non-hearsay because not offered to prove

24. The PCRA court also addressed an argument by appellant that El's statement was admissible because it was "inherently reliable" under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Appellant does not pursue that theory here.

truth of matter asserted, but rather to establish motive for killings).

■ "Generally, an alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party.... At the core of an alibi defense is, of course, consistency between the date and time of the crime and that of the defendant's alibi." *Commonwealth v. [Raymond] Johnson,* 600 Pa. 329, 966 A.2d 523, 538 & n. 5 (2009).

■ Here, the PCRA court correctly determined that appellant's underlying claim lacks merit because El's statement was inadmissible hearsay. El's statement could only be relevant to establish alibi if it was proffered for the truth of the matter asserted therein (that appellant supposedly was elsewhere, with El, when the victim was murdered). The bald fact that El's statement was made proves nothing, and certainly does not support an alibi. El's statement therefore was hearsay, unlike in *Johnson* and *Puksar.* Nor has appellant argued that El's statement fits within any of the recognized hearsay exceptions, such that it could be proffered for its truth, notwithstanding El's unavailability. In addition, as the Commonwealth notes, El's statement concerning appellant's whereabouts from 6:00 a.m. to 10:00 a.m. would not have established an alibi because Dr. Hood's testimony established that the killing occurred between 4:00 a.m. and 10:00 a.m. and perhaps even earlier. El's account, thus, would not "render it impossible" for appellant to have been the murderer. Trial counsel cannot be faulted for failing to pursue an alibi defense, premised upon an inadmissible hearsay statement of an unavailable witness that would not even establish alibi; appellant's derivative claim respecting appeal counsel necessarily fails as well.[25]

**25.** Included in the section of appellant's brief outlining his ineffectiveness/alibi argument, appellant also claims trial counsel ineffectiveness for failing to make use of the emergency room ("E.R.") records from N.M.'s treatment after the murder. Those records, appellant asserts, would have placed the time of N.M.'s injuries at 9:00 a.m. or 10:00 a.m.

128

## I. Failure to "federalize" state claims

Appellant next raises a confused claim sounding in direct appeal counsel's supposed ineffectiveness for failing to adequately "federalize" twenty-five of appellant's twenty-seven direct appeal claims by citing additional supportive federal decisions and constitutional provisions. Appellant claims that counsel's failure deprived him of the opportunity to have his claims adjudicated under federal constitutional standards. Appellant cites *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) and *Duncan v. Henry*, 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) in support of this theory. In addition to this general claim, appellant more specifically faults appeal counsel for failing to raise trial counsel's ineffectiveness for failing to seek suppression of the clothes iron appellant used to beat the victim. Appellant notes that the clothes iron was the basis for his conviction of possession of an instrument of crime. In a non-sequitur to his suppression argument, appellant asserts that a clothes iron is not commonly used for criminal purposes and that the admission of the clothes iron here, without objection by counsel, tainted the entire trial. Appellant contends that an argument for sup-

The Commonwealth responds that appellant failed to raise an argument regarding the E.R. records before the PCRA court and, therefore, this argument is waived. Our review of the pleadings below confirms that appellant did not raise a time-based argument involving the E.R. records. Appellant appears to allege in his brief that a copy of the E.R. chart was attached as "Exh–K" to his "Chief Amend. Petit." Appellant's Brief at 49 n. 22. It is unclear, however, to which of appellant's many petitions he refers and our review of all such petitions does not reveal any argument, discussion, or mention of the E.R. records. This claim, therefore, is waived. *See* Pa.R.A.P. 302(a).

Appellant also alleges in this section of his brief that, if counsel had mounted an alibi defense based on El's statement, he would have been entitled to a jury instruction on alibi. That goes without saying. But, because El's statement was inadmissible hearsay and did not support an alibi, this argument is a non-starter.

In yet another ill-developed, spin-off subsidiary argument, appellant alleges that he should have been afforded the opportunity to testify to alibi. Our review of the pleadings below reveals no claim of ineffectiveness premised upon counsel's supposed interference with, or unreasonable guidance respecting, appellant's now-alleged desire to testify to alibi. Hence, this claim is waived. *See Cousar, supra; see also Arroyo, supra.*

pression of the clothes iron should have been federalized by direct appeal counsel pursuant to *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

The Commonwealth responds that appellant's overall federalization complaint fails to state a cognizable claim under the PCRA. The Commonwealth argues that appellant has not provided sufficient legal authority for this abstract claim, nor has he explained how appeal counsel's "failure to federalize" his claims caused actual prejudice such that, but for appeal counsel's alleged lapse, the result of appellant's direct appeal would have been different. To the Commonwealth, appellant's claim is nothing more than an assertion that appeal counsel's alleged ineffectiveness might adversely affect appellant in some hypothetical future federal *habeas corpus* proceeding, which is not a cognizable ground for relief under the PCRA.

The Commonwealth also argues that *Kimmelman*, a federal *habeas* decision, does not speak to whether state direct appeal counsel may be found ineffective on this type of claim. Regarding the clothes iron, the Commonwealth notes that the evidence showed that the iron was specially adapted for criminal use when appellant used it to beat the victim; the iron therefore became an instrument of crime pursuant to 18 Pa.C.S. § 907(d)(2). The Commonwealth asserts that because a motion to suppress the iron would have been meritless, trial counsel cannot have been ineffective for failing to seek suppression.[26]

■ *Picard* and *Duncan* do not speak in terms of due process rights, but instead in terms of federal *habeas* exhaustion requirements for state prisoners who would seek to collaterally attack their final state convictions in federal court. In *Picard*, the U.S. Supreme Court held that state courts must have the first opportunity to hear a federal claim that a

26. The PCRA court did not address this issue in its opinion, notwithstanding that appellant raised his "federalization" claim in his June 2000 *pro se* "Supplemental Petition Under the PCRA" (pp. 17–22) and also in his *pro se* Rule 1925(b) statement (¶ 9). Nevertheless, because appellant's claim of direct appeal counsel ineffectiveness for failing to "federalize" appellant's claims is easily resolvable on the record and the briefs, we will decide it.

state prisoner anticipates raising in federal *habeas* proceedings so that all state remedies will be properly exhausted before federal review; in short, such claims generally must be "fairly presented" at the state court level before a federal complaint can be heard. 404 U.S. at 275, 92 S.Ct. 509. *Duncan* then speaks to the mechanics of exhaustion: to properly exhaust federal claims, state prisoners must present them expressly and specifically enough so that the state court addressing them will "surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." 513 U.S. at 365, 115 S.Ct. 887. In short, on federal *habeas* review, state prisoners should not be heard to complain about a state court's supposed rejection of federal claims that were not first identified and argued as such to the state courts.

Obviously, appellant's global ineffectiveness/"federalization" claim proves nothing in the abstract; to secure relief, he must prove ineffectiveness with respect to some specific federal claim that he feels was inadequately presented on direct appeal. The only claim appellant identifies with any specificity is his *Kimmelman* claim respecting trial counsel's failure to seek suppression of the clothes iron. But *Kimmelman*, like *Picard* and *Duncan*, speaks to a procedural matter, *i.e.*, the cognizability, on federal *habeas* review, of claims of counsel ineffectiveness arising from defaulted Fourth Amendment claims. The U.S. Supreme Court held that while Fourth Amendment claims in and of themselves cannot be litigated on federal *habeas*, pursuant to *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), a derivative Sixth Amendment ineffective assistance of counsel claim, based upon a defaulted Fourth Amendment issue, may be so litigated, subject to the settled test for ineffective assistance of counsel under *Strickland*. *Kimmelman*, 477 U.S. at 382–83, 106 S.Ct. 2574.

■ Here, appellant, who obviously has confused the theoretical availability of claims with what is necessary to prove them, has not set forth any basis to conclude that the clothes iron was admitted in violation of the Fourth Amendment, such

that a motion to suppress the iron should have been made. Appellant's argument that a clothes iron is not commonly used for criminal purposes is no basis for suppression of relevant evidence. It is a claim implicating evidentiary sufficiency. Notably, that very issue was resolved by this Court on direct appeal. *See Lester*, 722 A.2d at 1002 (holding that clothes iron was "specially adapted" for criminal purpose of murder pursuant to 18 Pa.C.S. § 907(d) when appellant broke handle off, used plate or front of iron to inflict lacerations on victim's head, and used handle to inflict punctures and lacerations around her left eye). Appellant's "federalization" claim, therefore, fails.[27]

## J. *Brady* Claims

Appellant next presents two claims primarily based upon *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but also alleges ineffective assistance of trial and direct appeal counsel to the extent that they could or should have uncovered the evidence implicated in these claims. First, appellant claims that the prosecution withheld evidence regarding the time of the victim's death, specifically, an unsigned handwritten report by an unnamed medical examiner's investigator that appellant alleges was in the medical examiner's file.[28] Appellant contends that the contents of this report could have been used to suggest that the time of death was

27. In a footnote, appellant indicates that he undertook to identify additional insufficiently federalized claims in an "addendum" that he provided to "the courts." This "addendum," which was attached to appellant's *pro se* supplemental PCRA petition of June 20, 2000, set forth twenty allegations of trial court error and ineffective assistance of counsel. In each such allegation, appellant claimed, *inter alia*, Fourteenth Amendment due process and equal protection violations and cited various purportedly supportive cases. Appellant has not, however, attended to any of these twenty claims with specificity in his brief to this Court. As such, these claims warrant no further review. *Commonwealth v. Lambert*, 568 Pa. 346, 797 A.2d 232, 237 n. 4 (2001) ("All claims for relief must be set out in the brief and [may] not [be] merely incorporated by reference"). *See also Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1092 n. 3 (1993) (same).

28. Appellant has attached a copy of this report to his brief, but it does not appear to have been presented to the PCRA court and is not of record.

within the period during which he was at El's apartment (according to El's out-of-court statement).[29]

Second, appellant claims that the Commonwealth withheld potential impeachment evidence regarding Joan Walker, whose testimony placed appellant in the victim's building on the night of the murder and portrayed him in an unfavorable and threatening light. Appellant claims that the prosecution did not inform the defense that at the time of appellant's trial, Ms. Walker had two felony drug charges pending against her for which bench warrants were still outstanding.

The Commonwealth responds that both of appellant's *Brady* claims are waived because, *inter alia*, they were not properly raised in his PCRA petition and amendments below. In addition, the Commonwealth argues, appellant's claim alleging suppression of the medical examiner investigator's report was not raised in appellant's Rule 1925(b) statement. The Commonwealth recognizes that the Federal Defender attempted to raise these new claims after the case was remanded to the PCRA court for the sole purpose of conducting the *Grazier* hearing. But, the Commonwealth argues, once appellant appealed the PCRA court's 2003 dismissal of his various PCRA petitions, the PCRA court had no jurisdiction to consider any new claims. The Commonwealth further notes that this Court's remand for the *Grazier* hearing was limited to that purpose and was not intended as an opportunity to present new not-of-record PCRA claims.[30]

The PCRA court's original opinion, issued in 2005, obviously did not address the *Brady* claim regarding the unsigned medical examiner's investigator report. Regarding Ms. Walker's status, both appellant and the Federal Defender identified this new claim in their Rule 1925(b) statements. But, the PCRA court held, the claim was not preserved for review because appellant did not raise it in his PCRA petition.

29. We have already passed upon appellant's claim alleging trial counsel ineffectiveness for failing to pursue an alibi defense premised upon El's statement. *See* Op., *supra*, at Section H.

30. The Commonwealth offers alternative arguments on the merits, which we will not reach since we agree that these claims are waived.

Appellant did not raise either of these *Brady* claims prior to his 2003 appeal. Indeed, Federal Defender Shawn Nolan, Esq., conceded as much at the April 27, 2007 *Grazier* hearing:

> Mr. Nolan: As you are aware, we filed some new claims in the case. Once the Supreme Court had remanded the case for a *Grazier* [h]earing, their actual remand order was silent on the question of jurisdiction [to hear new claims]. And so in an abundance of caution, we filed an amended petition with some new claims. . . .

> \* \* \*

> I just wanted to be clear that the record is clear and that the Court is finding that there is only jurisdiction for a *Grazier* hearing and not for other additional filings that were filed?

> The Court: That's correct.

N.T., 4/27/07, at 4–6. In its opinion on the *Grazier* issue, the PCRA court addressed the Federal Defender's attempt to raise new claims at the *Grazier* remand, as follows:

> As for counsel's next contention that this Court erred in not considering the amendments made to the PCRA petition, it should be noted that the amendments were filed after [appellant] had filed an appeal to the [Supreme] Court. In addition, the remand order from the [Supreme] Court instructed this Court only to conduct a *Grazier* colloquy. As stated by [Pa.R.A.P.] 1701, "After an appeal is taken . . . the trial court . . . may no longer proceed further in the matter." Therefore, this [c]ourt did not address the additional issues raised in the amended PCRA petition."

PCRA Ct. Op., 7/25/07, at 4 (internal citation omitted).

■ The PCRA court was correct. This Court's order of June 15, 2006, remanded the case for a single purpose, to conduct a *Grazier* hearing on appellant's request to proceed *pro se.*[31] We did not relinquish jurisdiction, much less did we

31. The body of that order reads as follows:

 AND NOW, this 15th day of June, 2006, the Philadelphia County Court of Common Pleas is directed to conduct a hearing within forty-five (45) days of the date of this order to determine whether [appel-

invite appellant to raise new issues or to file what would amount to a serial PCRA petition. Indeed, our retention of jurisdiction deprived the PCRA court of authority to act other than with respect to the *Grazier* issue upon which we remanded.[32, 33] In light of the foregoing, appellant's *Brady* claims are not reviewable by this Court.

## K. Failure to raise *Batson* objection

Appellant finally claims that direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to argue that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) at trial by exercising peremptory challenges in a racially discriminatory manner. Appellant also alleges, at great length, that at the time of his trial, the Philadelphia District Attorney's Office as a whole engaged in similar discrimination in a systematic manner, which is prohibited under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[34, 35] Appellant

lant's] waiver of his right to counsel on his pending appeal is knowing, intelligent and voluntary. *See Commonwealth v. Grazier* [552 Pa. 9], 713 A.2d 81 (Pa.1998).

32. The Federal Defender, in its unauthorized appeal from the PCRA court's order granting appellant relief under *Grazier*, attempted to argue that these new claims were preserved. That appeal was quashed by this Court in its October 31, 2007 order.

33. *See Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585 (2000) (as matter of jurisdiction, PCRA court cannot entertain new PCRA claims or new PCRA petition when prior petition is still under review on appeal). Moreover, because appellant's *Brady* claims herein are new, they are subject to the serial petition and time-bar restrictions of the PCRA.

34. Appellant refers to materials that have been the basis for a number of similar if not identical claims raised by other defendants: a 1987 videotaped training seminar given by then-Philadelphia Assistant District Attorney Jack McMahon; a 1990 jury selection lecture given by then-Philadelphia Assistant District Attorney Bruce Sagel; and notes of that lecture taken by then-Assistant District Attorney Gavin Lentz. *See, e.g., Commonwealth v. Cook*, 597 Pa. 572, 952 A.2d 594, 601 (2008). None of these prosecutors was involved in the selection of appellant's jury.

35. Appellant's brief acknowledges that aspects of *Swain* were overruled by *Batson*, which eased the defendant's evidentiary burden to establish purposeful discrimination in an individual case. The brief relies, rath-

maintains that this claim is based, in part, on newly discovered evidence of purported systematic discrimination that came to light after appellant lodged his current appeal.

The Commonwealth responds that appellant's *Batson/Swain* claims are waived for the same reason his *Brady* claims are waived: they were not raised in the PCRA petitions and amendment that were the subject of the PCRA court's 2003 order denying relief. Instead, the Commonwealth asserts that appellant first raised the claims, which are stock fare for the Federal Defender in Philadelphia cases (indeed, it appears that appellant has merely attached pages from the Defender's late pleadings), after this Court remanded in 2006 for the limited purpose of a *Grazier* hearing. The Commonwealth argues that appellant could not properly raise any new claims at that point because the PCRA court lacked jurisdiction to consider such claims.

The PCRA court likewise concluded, *inter alia,* that these claims were waived because they were not raised in the pleadings that were the subject of the court's 2003 ruling. Given our disposition of appellant's *Brady* claims, the resolution of these claims is straightforward. Appellant did not timely raise these claims before the PCRA court (in either an individualized or systematic form), and our limited *Grazier* remand did not open the case for the addition of new collateral claims. Thus, these claims are unreviewable.

## CONCLUSION

For the foregoing reasons, we affirm the order of the PCRA court.[36]

Justices SAYLOR, EAKIN, BAER, TODD, McCAFFERY, and ORIE MELVIN join the opinion.

er, upon the theory that the portion of *Swain* condemning systematic, widespread and clearly consistent patterns of discrimination remains viable.

36. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).