J-S40004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BYRON TAYLOR | : | |
| | : | |
| Appellant | : | No. 2344 EDA 2023 |

Appeal from the Judgment of Sentence Entered April 18, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No:  CP-51-CR-0000547-2021

BEFORE:  STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY STABILE, J.:                **FILED FEBRUARY 21, 2025**

Appellant, Byron Taylor, appeals from the judgment of sentence imposed by the Court of Common Pleas of Philadelphia County on April 18, 2023, made final by the denial of his post-sentence motion on August 24, 2023.  He challenges the denial of his motion to suppress identification evidence, the denial of his motion for retrial, the trial court's jury instruction, and the sufficiency and weight of the evidence.  Upon review, we affirm.

The trial court set forth the pertinent facts:

On July 22, 2019, the victim, Charles "Chop" Davis, was sitting on the church steps on Duval Street.  Around 11:00am that morning, Appellant, Byron Taylor arrived at the church and shot Mr. Davis in the head and chest multiple times.  The next day, Mr. Davis was pronounced dead due to 2 gunshot wounds and the manner of death was homicide.

After hearing gunshots, eyewitness Juanita Cooper, a neighborhood resident, ran to the nearest window of her house to see what was going on outside.  When she reached the window,

she saw Appellant straddling Mr. Davis and shooting down at him. Ms. Cooper saw a gun in his hand, which she described as being a handgun. She heard 2-3 gunshots[, and] then 2-3 more gunshots. Ms. Cooper remained inside her home and called police. Ms. Cooper looked back outside the window and saw an unknown woman [later identified as Taquana Alexander] run down the street. At the same time, police officers arrived and put the victim in the car to transport him to the hospital. Ms. Cooper gave a physical description of the shooter noting that he had brown to dark skin, dreadlocks that were pulled back to a ponytail, "a wife beater" t-shirt, dark colored shorts, sneakers, and white socks pulled up to his calf.

While giving a statement at the Homicide Unit on August 8, 2019, a detective showed Ms. Cooper a photo array. Detective Robert Hesser, assigned to the Homicide Division, reiterated his testimony at the motion to suppress hearing at trial about how he administered the photo array. He used a "double blind" photo array where he showed six photos, one at a time and the person administering the photo array has no knowledge of the case or the suspect. Ms. Cooper identified two individuals who she thought "possibly" could be the shooter. One of the two she identified is Appellant. Detective John McNamee showed Ms. Cooper a video from the day in question. Prior to being shown the video, she described the shooter to Detective McNamee, confirming her prior description, by stating "he was thin build. Dark or brown skin. He was five foot seven or eight. He has locks pulled back into a ponytail that came down to the middle of his shoulder blades. He was wearing a white t-shirt – they call them a wife beater – and it was tucked into some black or dark blue basketball shorts." Detectives showed Ms. Cooper the video and she recognized the man in the video as the shooter. In the video, the man's face is not seen. Ms. Cooper never identified Appellant in court as the shooter or the man in the video.

In the moments leading up to the shooting, Taquana Alexander, pulled up to the corner store to get a coffee. At this time, Ms. Alexander heard gunshots, saw a man on the ground, and saw Appellant running with a gun in hand. Ms. Alexander ran over to the scene as the police arrived and helped transport the victim's body into the police car.

After the shooting, Ms. Alexander made her way into the corner store where she encountered Philadelphia police officer Michael

- 2 -

Copestick and his partner. Officer Copestick noticed blood on her leg and asked her about the blood and what happened out front. Ms. Alexander stated that she witnessed a shooting up the block, helped the victim into the police car, and described the Appellant to the officers. Corroborating Ms. Cooper's description, Ms. Alexander noted that Appellant was wearing a "beater," and had "dreads."

On July 30, 2019, Ms. Alexander was brought down to the Homicide Unit for an interview. Ms. Alexander told detective that she knew [Appellant], having had ten interactions with [Appellant] prior to July 22, 2019. Ms. Alexander saw the video of Appellant walking down the street and identified him as the person she saw shoot Mr. Davis. Because Ms. Alexander knew Appellant, police showed Ms. Alexander only one photo and she identified [Appellant] as the shooter of Mr. Charles Davis.

Trial Court Opinion, 1/30/24, at 3-6 (citations to record omitted).

Throughout the entire investigation and through trial, Ms. Alexander consistently identified Appellant as the person she saw at the scene of the shooting, as well as the individual on the surveillance video. However, her testimony was inconsistent as to whether she witnessed the shooting or not, and whether she observed Appellant with a firearm or not.

On August 18, 2019, Appellant was charged with homicide and related offenses. Appellant filed a motion to suppress identification testimony, and a hearing was held on January 3, 2023. The trial court denied Appellant's motion to suppress, and the case proceeded to trial. After a two-day jury trial, Appellant was convicted of first-degree murder, carrying firearms in public in Philadelphia and possession of an instrument of crime. On April 18, 2023, Appellant was sentenced to life without the possibility of parole for first-degree murder and no further penalty on the remaining convictions. Appellant

filed a post-sentence motion, which was denied by operation of law on August 24, 2023. This appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises five issues for our review, which we have reordered for ease of discussion:

I. Was the trial court's decision denying Appellant's motion to suppress identification evidence from witnesses Juanita Cooper and Taquana Alexander clearly erroneous?

II. Was the evidence insufficient as a matter of law to convict on all charges?

III. Was the jury's verdict against the weight of the evidence?

IV. Did the trial court abuse its discretion by denying Appellant's motion for mistrial after receiving a note from the jury indicating that they were concerned about their safety due to the defendant's "mannerisms" toward family members who had come to court to support him?

V. Did the trial court abuse its discretion by refusing the defense request for a *Kloiber* charge as to eyewitness Taquana Alexander's testimony?

Appellant's Brief, at 10 (our pagination).[1]

Appellant first challenges the denial of his motion to suppress the eyewitness identification by Taquana Alexander and Juanita Cooper. He argues that "[e]ach identification was tainted by an impermissibly suggestive identification procedure, which resulted in irreparable misidentifications by

_____

[1] Appellant's brief is unpaginated. The table of contents indicates that the Argument section begins on page 31, but that is inaccurate. Therefore, we began page numbering with the Statement of Jurisdiction.

each witness." Appellant's Brief, at 27 (our pagination). He contends that police procedures highlighted Appellant as a suspect to each witness. *Id.* at 29 (our pagination).

On July 30, 2019, Ms. Alexander was interviewed about her knowledge of the shooting by Detective Orlando Ortiz of the Philadelphia Police Department. N.T. Suppression, 1/3/23, at 15. He was not assigned to the case, and his only involvement was to interview Ms. Alexander. *Id.* at 27. Prior to the interview, Detective Ortiz was only aware that Ms. Alexander had information in reference to the shooting, and did not recall whether he was told that Appellant was the suspected shooter. *Id.* at 27-28. Ms. Alexander stated that she had known Appellant for approximately a month before the shooting occurred, having about 10 interactions with him within that time. *Id.* at 16. One on occasion, Appellant was inside Ms. Alexander's vehicle, and they got into an argument about money missing from her vehicle. *Id.* at 17. She identified Appellant by name, Byron, as well as a nickname, 'B,' and provided a physical description – Black male with braids wearing a white shirt. *Id.* at 16, 26.

During the interview, Ms. Alexander was shown a single photograph, which she identified as Appellant. *Id.* at 16. Detective Ortiz explained that it was their policy that if an alleged offender is known to a victim or witness, then a single photograph may be used for identification. *Id.* at 15. After Ms. Alexander identified Appellant's photograph, she was shown surveillance video

from the day of the shooting and identified Appellant as the individual on the video. *Id.* at 18-20.

Ms. Cooper witnessed the shooting from her window and did not know Appellant. On August 7, 2019, Detective Robert Husser administered a double-blind photo array by showing Ms. Cooper a set of photographs and asking if she recognized anyone. *Id.* at 43. He explained a double-blind photo array:

> The double-blind, the way it works now is you have a face sheet that you read to the person that you're going to be showing the spread to, and then a series of six boxes. You're showing six photos instead of eight. The photos are shown one at a time, and you record the person's response.
>
> The main thing about a double-blind photo spread is this, they're shown by people who really didn't work on the case. So I don't have any knowledge of the case or who the prime is – you know, who the suspect would be, if there's a suspect in there at all.

*Id.* at 42-43. Detective Husser was not assigned to the case, was unaware if there was a suspect and did not know any facts about the shooting prior to showing Ms. Cooper the photo array. *Id.* at 45, 47. Ms. Cooper identified two photographs as "possibly" being the shooter – one of which was Appellant. *Id.* at 49-50.

Detective John McNamee then separately interviewed Ms. Cooper. *Id.* 52. He also was not assigned to the case and did not know who the suspect was, or if there was one, nor was he present when the photo array was administered. *Id.* at 52-53. Ms. Cooper provided a detailed description of the shooter:

He was thin build.  Dark or brown skin.  He was five foot seven or eight.  He has locks pulled back in a ponytail that came down to the middle of his shoulder blades.  He was wearing a white T-shirt – they call them a wife beater – and it was tucked into some black or dark blue basketball shorts.

*Id.* at 56-57.  Thereafter, Detective McNamee showed Ms. Cooper the same surveillance video that was shown to Ms. Alexander.  *Id.* at 53.  Ms. Cooper identified the person in the video as the same person she observed standing over and shooting the victim.  *Id.* at 54.  Importantly, because she did not see the face of the person she identified in the video, she could not identify the individual as Appellant.  *Id.* at 54.

Our standard of review when addressing a challenge to the denial of a suppression motion is

limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*.  Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (internal citations omitted).  Our scope of review is limited to the record created during the suppression hearing.  *In re L.J.*, *supra*.

"It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony."  *Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019).  "[I]f there is sufficient evidence of record to support the suppression court's ruling and

that court has not misapplied the law, we will not substitute our credibility determinations for that of the suppression court judge." **Commonwealth v. Queen**, 639 A.2d 443, 445 (Pa. 1994).

When analyzing the admission of identification evidence, a suppression court must determine

> whether the challenged identification has sufficient indicia of reliability. This question is examined by focusing on the totality of the circumstances surrounding the identification. In deciding the reliability of an identification, a suppression court should evaluate the opportunity of the witness to see the criminal at the time the crime occurred, the witness's degree of attention, the accuracy of any description given, the level of certainty when identification takes place, and the period between the crime and the identification.

**Commonwealth v. Sanders**, 42 A.3d 325, 330 (Pa. Super. 2012), *appeal denied*, 78 A.3d 1091 (Pa. 2013) (citations omitted). "A pre-trial identification violates due process only when the facts and circumstances demonstrate that the identification procedure was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification." **Commonwealth v. Johnson**, 139 A.3d 1257, 1278 (Pa. 2016) (citation omitted). "Thus, where a defendant does not show that improper police conduct resulted in suggestive identification, suppression is not warranted." **Sanders**, 42 A.3d at 330.

Here, the trial court denied Appellant's motion to suppress identification evidence and explained:

> Detective Ortiz, the detective who showed Ms. Alexander the photo of [Appellant], was not assigned to the case, nor did he

- 8 -

have any prior knowledge about the case. He merely showed the witness the photo. When showing her the phone, he asked, "Is this the person who you're saying Byron is?" Ms. Alexander replied "yes." She made the identification. Based on that interaction, there is nothing in the record that showed the process was unduly suggestive nor indicated any police misconduct.

Additionally, the single photo identification made by Ms. Alexander was proper. Our Supreme Court has held that "[w]hile the use by police of a single photograph of a suspect in securing identification by a witness can constitute an improperly suggestive procedure, . . . the reliability of a challenged identification is to be judged under a test employing the totality of the circumstances." *Commonwealth v. Buehl*, 508 A.2d 1167, 1178 (Pa. 1986), *cert. denied*, 488 U.S. 871 (1998).

Here, the record demonstrates that, under the totality of the circumstances, the identification procedure was not improperly suggestive for either identification. The facts reflect that Ms. Alexander had known Appellant for about [a] month. During her interview with Detective Ortiz, she told him that there were 10 interactions between them and some where she spoke to Appellant. At some point, Appellant was in the car with Ms. Alexander and had an argument with [her]. She had ample opportunity to observe [Appellant] over the course of time prior to the murder.

In terms of Ms. Cooper, she did not identify Appellant as the shooter [during her interview or] at trial. She merely indicated that she believed the shooter could "possibly" be one of two people in the photo array. Nothing in the photo array was improper or overly suggestive. Ms. Cooper was shown the video and was able to identify the person in the video as the shooter, but she did not identify Appellant, as the face of the person in the video is not shown.

Trial Court Opinion, 1/30/24, at 15-16 (citations to record omitted). We agree with the trial court's analysis, which is supported by the record. Ms. Cooper provided a very detailed description of the shooter and confirmed that the individual in the surveillance video was the shooter. She did not identify

- 9 -

Appellant as the shooter during her interview. As for Ms. Alexander, the trial court is correct that even though she was shown a single photograph, it was not overly suggestive because she knew Appellant. She verified that the person she knew as "B" was Appellant. Appellant has failed to show that improper police conduct resulted in a suggestive identification; therefore, no relief is due on this claim. *See Johnson, supra; Sanders, supra.*

Appellant's challenges to the sufficiency and weight of the evidence are an extension of his argument that the identification procedure was improper. He claims that the evidence was insufficient to sustain his convictions because the Commonwealth failed to prove Appellant was the shooter. Appellant's Brief, at 43 (our pagination). His sole argument is that police used "an illegally suggestive identification procedure" with both Ms. Alexander and Ms. Cooper. *Id.* at 43-44 (our pagination). As a result, Appellant argues, the Commonwealth failed to present sufficient evidence to prove he was the shooter beyond a reasonable doubt. *Id.* at 45 (our pagination).

Our standard of review is:

whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable

doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Brown***, 23 A.3d 544, 559-60 (Pa. Super. 2011) (*en banc*) (internal citations omitted).

Here, Appellant is arguing that the Commonwealth failed to prove that he was shooter. He does not challenge any other element of the crimes for which he was convicted. For the same reasons Appellant is not entitled to relief on his first claim, he likewise is not entitled to relief on this claim. The identification procedures utilized by the Philadelphia Police Department were not impermissibly suggestive. Ms. Cooper provided a detailed description of the shooter but without facial identification, whom she identified as the individual on the surveillance video. She was shown a double-blind photo array and identified Appellant as one of two individuals who were "possibly" the shooter. As for Ms. Alexander, Appellant was known to her. She likewise provided a detailed description of the shooter and verified that Appellant was the person she knew as "B" and had seen running from the scene.

The officer who showed Ms. Cooper the double-blind photo array was not assigned to the case, did not know details about the case and was unaware if there was a suspect. Another officer who was not assigned to the case showed Ms. Cooper the surveillance video. Likewise, Ms. Alexander was interviewed by an officer who was not assigned to the case, did not know any details and was unaware if there was a suspect. Therefore, we conclude the

Commonwealth presented sufficient evidence to prove that Appellant was the shooter.

Alternatively, Appellant challenges the weight of the evidence arguing that the identification evidence was tainted, and the Commonwealth presented "no evidence that ties [Appellant] to the scene of the crime or proves that [Appellant] was involved in the shooting." Appellant's Brief, at 46 (our pagination).

A challenge to the weight of the evidence concedes that there was sufficient evidence to sustain the verdict. *See Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000). We employ an abuse of discretion standard:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing the trial court's determination that the verdict is against the weight of the evidence.

*Id.* at 753. For the same reasons that Appellant is not entitled to relief on either his first or second claims, he is not entitled to relief on this claim. As discussed in detail, the identification procedure was not impermissibly suggestive. In addition, the Commonwealth presented substantial evidence to prove Appellant was the shooter, including the testimony from two eyewitnesses, whose testimony was corroborated by surveillance video. Thus, no relief is due.

- 12 -

Next, Appellant contends that the trial court abused its discretion when it denied his motion for mistrial. Appellant's Brief, at 34. (our pagination). During deliberations, the jury sent the following note to the trial court:

> We are concerned about our safety because of [Appellant's] mannerisms toward those in the audience / family. What precautions will be taken for our safety? *Can this be addressed in private?

N.T. Trial, 4/6/23, at 34. Appellant claims that the jury's question "was an indication of actual prejudice toward [Appellant]" because "the jurors were worried about their own safety while they considered the evidence against [Appellant]." Appellant's Brief, at 36-37 (our pagination). Appellant requested a mistrial based upon this question arguing that he was prejudiced because the jury was attributing their safety issues to Appellant and his family. *Id.* at 35. Appellant suggested the trial court question each juror individually but yet argued that the questioning would not cure the prejudice. *Id.* at 36.

Ultimately, the trial court asked each juror if they had any personal concerns and whether they could still be fair and impartial. *Id.* at 50-67. The foreperson indicated that there was some concern due to Appellant looking back toward his family during the trial, which the trial court also observed. *Id.* at 49, 51. One juror felt that the general street knowledge was dangerous. *Id.* at 60. Another juror explained a situation that happened before trial where a random person found his way into the jury room. The juror wanted to ensure the jury's safety because there were a lot of people in the area. *Id.* at 63-64. However, the juror did not believe the random person was related

- 13 -

to the instant case. *Id.* at 64. Despite the responses from two jurors regarding their safety, all the jurors testified under oath that they could continue being fair and impartial. *Id.* at 50-67. Thereafter, the trial court denied Appellant's request for mistrial.

Our standard of review of a denial of a motion for mistrial is an abuse of discretion:

> A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial.

*Commonwealth v. Bennett*, 225 A.3d 883, 890 (Pa. Super. 2019) (citation omitted).

Here, we discern no abuse of discretion. The question from the jury indicated that they were concerned for their safety due to Appellant's "mannerisms." The trial court questioned each juror individually and specifically asked about Appellant's mannerisms. The foreperson indicated that the jurors were concerned with Appellant looking back at his family during trial. However, when specifically asked, only two jurors responded with any concern – one was concerned that general street knowledge was dangerous, and the other was concerned because an unknown person found their way into the jury room. Under questioning by the court, none of the jurors expressed any concern regarding Appellant's mannerisms. Moreover, all

- 14 -

jurors stated that they could remain fair and impartial and evaluate the case based on the evidence presented. As there were no indicia of prejudice, we conclude that the trial court did not abuse its discretion when it denied Appellant's motion for mistrial. No relief is due on this claim.

Appellant's final claim is that the trial court abused its discretion when it denied the defense request for a jury instruction under ***Commonwealth v. Kloiber***, 106 A.2d 820 (Pa. 1954), regarding Ms. Alexander. Appellant's Brief, at 39 (our pagination). As explained above, Ms. Alexander knew Appellant and told police that she drove to the store on the corner of Germantown and Duval Streets in Philadelphia, heard gunshots, saw Appellant running away, and drove her vehicle to the scene to assist the person who had been shot.

Ms. Alexander told Officer Michael Copestick of the Philadelphia Police Department, the day of the shooting, that she witnessed Appellant shoot the victim and provided a detailed description of Appellant. N.T. Trial, 4/4/23, at 190. Officer Copestick confirmed her statement. ***Id.*** at 190. After responding to the scene, Officer Copestick went to the store on the corner of Germantown and Duval Streets to review surveillance video. ***Id.*** at 187-88. While there, Ms. Alexander came into the store, and he observed blood on her clothing. ***Id.*** at 188. He inquired about the blood, and she asked to speak in the back of the store, away from the other customers. ***Id.*** Officer Copestick described Ms. Alexander as terrified, sweating, nervous and shaking. ***Id.*** at 189. Ms. Alexander told Officer Copestick that she witnessed the shooting and drove

her vehicle to help the person who had been shot. *Id.* at 190. She described the shooter as "a skinny black male that she knows as B with dreadlocks with gold tips and a white tank top." *Id.* Officer Copestick did not conduct a formal interview, but left his card. *Id.* at 191. Ms. Alexander called Officer Copestick later that evening and reiterated what she told him in the grocery store earlier. *Id.* at 192.

Eight days later, on July 30, 2019, Ms. Alexander provided a formal interview to police. At that time, she told police that she knew Appellant and again gave a detailed description, but did not say that she witnessed the shooting or that she saw Appellant with a firearm. *Id.* at 135, 138-39. She was shown a single photograph and confirmed that Appellant was the individual she knew as "B" that she saw at the scene. Additionally, she was shown a surveillance video from the day of the shooting and identified Appellant as the person in the video. During the preliminary hearing, Ms. Alexander testified that she did not remember speaking with police and that she had memory loss due to a seizure disorder. *Id.* at 148-50.

At trial, Ms. Alexander identified Appellant as someone she knew for a short period. *Id.* at 84-85. She testified that she witnessed Appellant shoot the victim and saw "something black" in his hand. *Id.* at 92, 96. Ms. Alexander explained that her testimony differed slightly because there is a "code" in Philadelphia where you are not supposed to tell if you witness a shooting. *Id.* at 156. That "code" made her afraid of retaliation and feared

for the safety of herself and her children. *Id.* at 98-99, 156. Since her circumstances changed by the time of trial, she no longer lived with that fear. *Id.*

Appellant requested a *Kloiber* charge for both witnesses – Ms. Cooper and Ms. Alexander. N.T. Trial, 4/5/23, at 108. The trial court granted the request for Ms. Cooper but denied the request for Ms. Alexander. *Id.* at 122-23. The trial court stated that pursuant to *Commonwealth v. Reid*, 99 A.3d 427 (Pa. 2014), the instruction does not apply where the suspect or defendant is known to the witness. *Id.*

"Our standard of review when considering the denial of jury instructions is one of deference – an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Cannavo*, 199 A.3d 1282, 1286 (Pa. Super. 2018), *appeal denied*, 217 A.3d 180 (Pa. 2019) (citation omitted). In *Kloiber*, our Supreme Court held:

> where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

*Kloiber*, 106 A.2d at 826-27. Thus, a defendant is entitled to a *Kloiber* instruction where a witness: (1) was not in a position to clearly observe the defendant or is not positive as to identity; (2) equivocated on the identification; or (3) failed to identify the defendant on prior occasions.

- 17 -

*Commonwealth v. Ali*, 10 A.3d 282, 303 (Pa. 2010). "Where an eyewitness has had protracted and unobstructed views of the defendant and consistently identified the defendant throughout the investigation and at trial, there is no need for a *Kloiber* instruction." *Id.* Thus, "[w]hen the witness already knows the defendant, this prior familiarity creates an independent basis for the witness's in-court identification of the defendant and weakens ineffectiveness claims based on counsel['s] failure to seek a *Kloiber* instruction." *Reid*, 99 A.3d at 448 (citing *Ali*, 10 A.3d 282, 303).

Appellant is not entitled to relief. As explained in detail above, Appellant was known to Ms. Alexander and consistently identified Appellant as the person she saw at the scene, as well as the person in the surveillance video. Whether she saw the shooting or not, and whether she saw Appellant with a firearm or not, goes to the credibility of the witness, not to the identification of Appellant. Therefore, there was no need for a *Kloiber* instruction. *See Ali, supra; Reid, supra.*

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/21/2025

- 18 -